907 So.2d 849 (2005)
Rachel BYRD, Plaintiff-Appellant
v.
CADDO PARISH SCHOOL BOARD, Defendant-Appellee.
No. 39,793-WCA.
Court of Appeal of Louisiana, Second Circuit.
June 29, 2005.
*851 Robert A. Booth, Jr., for Appellant.
Eskridge E. Smith, Jr., Bossier City, Linda Lea Smith, for Appellee.
Before GASKINS, CARAWAY and LOLLEY, JJ.
CARAWAY, J.
The workers' compensation judge ("WCJ") denied benefits to the employee after finding that she had not succeeded in her burden of proving that a work-related accident caused or exacerbated her cervical and back injuries and need for surgery. Finding no error in that determination, we affirm the dismissal of this action.

Facts
On April 27, 2001, Rachel Byrd was employed by the Caddo Parish School Board ("School Board") as a fifth grade teacher at Lakeshore Elementary School. As she escorted her class up a flight of stairs from the lunchroom to her classroom, one of the students grabbed Byrd by the ankle and caused her to fall. Byrd reported the incident to her supervisor and then sought medical attention at Willis-Knighton Work Kare. She complained of neck, chest and left hand pain. Dr. Raymond Dennie prescribed medication and released Byrd from his care to regular duty without limitations. Byrd completed the workday and continued teaching through the end of the school year and the beginning of the next.
On October 23, 2001, Byrd was examined by her family physician, Dr. Mairus McFarland, with complaints of headaches and a possible retinal detachment which she reported had happened on September 25, 2001. Dr. McFarland noted his previous treatment of Byrd for fibromyalgia and cervical disc disease diagnosed in October of 1995.[1] Dr. McFarland also reported that in 1996 he had treated Byrd for depression and severe problems with mood and affect, but that she had been able to return to the classroom and had done very well.[2]
*852 On November 1, 2001, Dr. McFarland re-evaluated Byrd regarding the eye condition and noted evidence of slight fibrositis and elevated rheumatologic factors. Byrd was referred to Dr. Robert Goodman for a rheumatology consult on November 13, 2001. Byrd reported to Dr. Goodman that she began to experience a tingling in her right arm and leg which seemed to begin on September 25, 2001, although she could recall no precipitating event. Byrd also complained to Dr. Goodman regarding her eye condition and headaches. Dr. Goodman diagnosed Byrd with osteoarthritis, fibromyalgia and a migraine headache and referred her to Dr. George Beach, a neurological surgeon. X-rays conducted by Dr. Goodman also confirmed Byrd's herniated and bulging cervical disks.
On December 3, 2001, Byrd saw Dr. Beach. She complained to him of neck pain that began abruptly on September 25, 2001 when she was staying on a couch in the hospital room with her son. Byrd told Dr. Beach that she had "suddenly developed numbness involving the entire right half of [her] body, as well as weakness of the entire right half of [her] body." Dr. Beach acknowledged that Byrd had cervical spondylosis, but did not "really know" what her problem was and did not recommend surgery.
Byrd continued to see Dr. McFarland from December 2001 through February 2002 with complaints of neck pain, irritability, anxiety and depression. Dr. McFarland related the neck pain to a bulging disc and degenerative changes in Byrd's neck and the depression to Byrd's inability to work. It was on March 6, 2002 that Byrd first related her severe pain to the April 2001, on-the-job injury. Byrd also had begun to experience hallucinations of something crawling on her arms. In his notes, Dr. McFarland recalled that Byrd's previous psychotic symptoms in 1995 had responded well to medication.
A March 14, 2002 report by Dr. McFarland amended his previous report with information given to him by Byrd regarding the April 2001 accident. McFarland noted that Byrd told him that after the accident she was treated at Willis-Knighton and continued to work despite the pain. Byrd told Dr. McFarland that her symptoms worsened by October of 2001 when she had first reported to him. Dr. McFarland wrote that it was "possible that [Byrd's] on-the-job injury at school could have exacerbated her condition."
By April of 2002, Dr. McFarland reported that Byrd's psychotic symptoms had indeed responded to medication. Byrd saw Dr. McFarland three times in May of 2002 with continued complaints of pain. On May 16, 2002, Byrd again related her continued complaints of pain to the April 2001 accident and Dr. McFarland referred her to Dr. Anil Nanda for an evaluation of her cervical disc disease. On May 23, 2002, Dr. McFarland reiterated his belief that this accident exacerbated Byrd's condition. Dr. Nanda saw Byrd on May 22, 2002 and reported mild disk herniation at C4-5 and C5-6. Dr. Nanda first treated Byrd conservatively with physical therapy.
On September 4, 2002, Byrd visited Dr. Dennie at Willis-Knighton Work Kare for an independent medical evaluation regarding the April 27, 2001 accident and Byrd's reported neck injuries. At that time, Dr. Dennie comprehensively reviewed Byrd's medical history and the reports of each of her treating physicians after April 27, 2001, as well as the 1995 diagnosis of cervical disc problems in her neck. Dr. Dennie diagnosed Byrd with cervical disc syndrome but could not identify the current medical status of Byrd regarding the April 27, 2001 accident. Regarding the issue of causation, he concluded that "the *853 most that can be said about her current complaints is aggravation of a prior existing cervical problem."
Dr. Nanda performed an anterior cervical diskectomy with fusion at C5-6 on November 26, 2002. On January 7, 2003, Byrd reported a 50% improvement in her neck pain to Dr. McFarland but complained about back pain going down her leg. Dr. McFarland related the back pain to Byrd's fibromyalgia. On February 24, 2003, an MRI revealed degeneration and bulging discs at L4-5 and L5-S1. An April 14, 2003 myelogram revealed a bulging disc at L4-5. On June 12, 2003, Dr. Nanda performed a decompressive lumbar laminectomy at L5, L4 and partial L3. Dr. Nanda reported "good relief of her symptoms."
On December 4, 2003, Dr. Goodman diagnosed Byrd with undifferentiated connective tissue disease; she refused to submit to lab work. Dr. Goodman reported that Byrd's "affect was quite flat" throughout the office visit and that she was seeing Dr. Nave for multiple psychological diagnoses. Dr. Nave diagnosed Byrd with major depression in 2003 and recommended that she not return to work through December 31, 2003.
In addition to the medical evidence, Byrd testified on her own behalf and stated that on the day of the accident, she was escorting her class up a flight of stairs after lunch. A student grabbed her ankle and she fell face down onto the stairs. Byrd generally corroborated her medical history and testified that she completed the school year in pain. During the summer, Byrd testified that she rested, but the pain did not subside. Byrd returned to work in the fall but continued to have worsening pain. In October 2001, Byrd testified that Dr. McFarland took her off of work because of the worsening pain in her neck. She took one week off from work, but when she returned her condition was no better. Byrd testified that Dr. McFarland took her off of work permanently in December, 2001 and she has not returned to work since then. Byrd also testified regarding four or five total work-related accidents that she had experienced as a teacher. She stated that she is unable to work since her neck surgery. Byrd concluded that her surgeries, hallucinations and depression were the result of the April 27, 2001 accident which aggravated her pre-existing problems and anxiety. She stated that she was fine before the accident which caused her need for both the neck and back surgeries.
The court questioned Byrd about her visit with Dr. Beach specifically regarding the reported problem she had while sitting with her son who was in the hospital on September 25, 2001. Byrd denied making the statement to Dr. Beach and insisted that she only talked with him a couple of minutes before he escorted her out of his office. Byrd testified that neither Drs. Dennie nor Beach were thorough in their examinations.
The School Board paid all reasonable and necessary medical expenses arising as the result of the April 27, 2001 accident, which included payment of $85.00 for Byrd's initial Willis-Knighton Work Kare visit. Byrd filed a disputed claim for workers' compensation benefits on September 27, 2002, claiming that the April 27, 2001 accident exacerbated her fibromyalgia and chronic fatigue syndrome and caused her herniated cervical disc. The School Board answered, denying that Byrd had a compensable injury as the result of a work-related accident.
Trial of this matter occurred on August 3, 2004. Byrd represented herself in the proceedings. In denying and dismissing Byrd's claim for benefits, the WCJ ruled as follows:

*854 IT IS THE FINDING OF THIS COURT that the claimant, RACHEL BYRD, did not provide truthful testimony, provided untrue statements to her doctor, and failed to meet her burden of proof to establish by a preponderance of the evidence that she suffered a disabling injury as a result of an on-the-job accident alleged to have occurred on April 27, 2001.
From this ruling, Byrd has appealed.

Discussion
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Murray v. Hollywood Casino, 38,539 (La.App. 2d Cir.6/23/04), 877 So.2d 199. In applying the manifest error/clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Id. Whether the claimant has carried his burden of proof and whether testimony is credible are questions of facts to be determined by the hearing officer. Lewis v. Chateau D'Arbonne Nurse Care Center, 38,394 (La.App. 2d Cir.4/7/04), 870 So.2d 515. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
In a worker's compensation action, the plaintiff must establish a work-related accident by a preponderance of the evidence. Millage v. Builder's Lumber & Supply Co., 38,635 (La.App. 2d Cir.7/2/04), 877 So.2d 1171, writ denied, 04-1885 (La.10/29/04), 885 So.2d 594. Proof by a preponderance of the evidence exists when the evidence, taken as a whole, shows the facts sought to be proved are more probable than not. Lewis v. Chateau D'Arbonne Nurse Care Center, supra. If the evidence is evenly balanced or shows only some possibility that a work-related event produced the disability or leaves the question open to speculation or conjecture, then the plaintiff fails to carry the burden of proof. Player v. International Paper Co., 39,254 (La.App. 2d Cir.1/28/05), 892 So.2d 781. The causal connection can be established when the employee proves that before the accident he was in good health, but commencing with the accident, symptoms of the disabling condition appeared, and there is sufficient medical evidence to show a reasonable possibility of a causal connection between the accident and the disabling condition. Id. An employee's pre-existing condition does not disqualify his claim if the work-related injury either aggravated or combined with the infirmity to produce disability for which compensation is claimed. Id.
The worker's testimony alone may be sufficient to satisfy this burden, provided that two elements are satisfied: first, there must be no other evidence which discredits or casts serious doubt on the worker's version of the incident; and second, the worker's testimony must be corroborated by the testimony of fellow workers, spouses and other close family members, friends or the introduction of medical evidence. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992). The weight afforded a treating physician's testimony is largely dependent upon the facts upon which his opinion is based. A claimant's lack of credibility on factual issues can serve to diminish the veracity of her complaints to a physician. Perow v. Lenzly, 30,834 (La.App. 2d Cir.8/19/98), 716 So.2d 519.
The WCJ is afforded considerable discretion in evaluating expert testimony, and the decision to accept the testimony of one expert over the conflicting testimony of another can virtually never be manifestly erroneous. Anthony v. BE & *855 K Construction, 32,729 (La.App. 2d Cir.5/10/00), 760 So.2d 608, writ denied, 00-1673 (La.9/15/00), 768 So.2d 1280. The court may accept or reject the opinion of a medical expert depending upon what impressions the qualifications, credibility, and testimony of that expert make on the court. Spence v. Industrial N.D.T., 31,744 (La.App. 2d Cir.3/31/99), 731 So.2d 473.
In this case, even aside from the WCJ's emphasis on Byrd's veracity and credibility, Byrd did not link any of her medical symptoms to the work-related accident until almost a year after it happened. In the meantime, she had seen multiple doctors for various symptoms, never reporting the accident as the cause of her troubles. Her pre-existing disc disease would place the issue of causation in doubt because of the possibility that various life activities could cause a reoccurrence of spine-related symptoms. She certainly never overcame that doubt when she failed to link her problems to the accident in her reports to physicians over such a long period of time. Accordingly, the most that any of her treating physicians could state was that it was only a possibility that the accident aggravated her previous neck injuries. Her pre-existing condition alone therefore represents a reasonable explanation for her symptoms, and the WCJ's conclusion that the work-related accident did not cause injury is not manifestly erroneous.
The WCJ's judgment is affirmed. Costs of this appeal are assessed to appellant.
AFFIRMED.
NOTES
[1] Dr. Austin Gleason had treated in 1995 Byrd for another work-related accident which occurred in March of 1995 but concluded that she could not have been injured in the work-related incident and recommended that she see a psychiatrist.
[2] The School Board records submitted into evidence show that Byrd missed work from October of 1995 through August of 1999.