hCOOKS, Judge.
On January 3, 1997, Timothy Brooks was employed by Capitol Manufacturing Company as an operator of a machine that threads couplings made from a two-inch steel pipe. According to Brooks, on that date his machine ran out of hydraulic fluid. To refill the machine with fluid, the operator must climb a ladder to reach the top of the machine and the hydraulic fluid reservoir. Brooks stated, while filling the | ^reservoir, he fell from the top rung of the ladder to the floor, a distance of about six feet and landed on his low back and buttocks. He had immediate pain in his back, buttocks and testicles. There were no witnesses to the fall.
According to Brooks, the accident occurred about 10:35 p.m., shortly before his shift ended at 11:00 p.m. After the accident Brooks stated he looked for Carl Prud-homme (his supervisor) to report the accident, but was unable to locate him before the end of his shift. When he entered the parking lot, Brooks stated he noticed Prudhomme’s truck was not there.
Brooks’ wife picked him up that evening, and he told her about the accident. They drove directly to his grandfather’s house, and Brooks told his grandfather about the accident. According to Brooks, he continued to have pain and symptoms that night and the next day. Despite the pain, Brooks did not seek medical attention that weekend and returned to work on Monday because he did not want to lose his job.
That Monday, Brooks reported the accident to Carl Prudhomme and the safety director, Mike France. According to Brooks, France refused to complete an accident report and told Brooks if he could not work to go home. On his way home, Brooks ran into a co-worker, Scott Miller, in the Capitol Manufacturing parking lot. Brooks told Miller about the accident and his injuries. Immediately after talking to Miller, Brooks went to the American Legion Hospital in Crowley where he was treated for his injuries, prescribed medication and referred to Dr. Michael Holland.
Dr. Holland first saw Brooks on January 15, 1997. He found Brooks was suffering from a lumbar strain and he ordered conservative treatment consisting primarily of physical therapy. On the next visit, Brooks related he was experiencing severe back pain and radiating pain and numbness in his left leg. Dr. Holland opined that Brooks may have sustained a herniated disk in his lumbar spine and scheduled an MRI. The MRI was poor in quality, and no obvious herniated disk was detected.
13Brooks sought a second opinion from Dr. Douglas McKay, an orthopedic surgeon, on March 5, 1997. Dr. McKay reviewed the MRI performed on January 23, 1997, and concluded it showed a mild to moderate hypertrophy throughout his lumbar spine and a mild congenitive narrowing of the spinal canal. Dr. McKay requested the performance of a lumbar mye-logram, but Capitol would not authorize payment for it.
Brooks began working for Grey Wolf Drilling on April 12, 1997. According to Brooks, he was forced to work for Grey Wolf because Capitol refused to pay any disability benefits or the costs of medical care. He testified he took pain and anti-inflammatory pills each day he worked for Grey Wolf. Brooks worked as a roustabout for Grey Wolf, but was physically unable to perform the strenuous duties. He quit the job on April 29, 1997. Brooks testified he did not injure himself while working for Grey Wolf. He stated he was injured when he started at Grey Wolf and was hurting when he stopped working for that company. Brooks admitted he lied during his pre-employment physical for Grey Wolf when he told the nurse he was “fine.”
After his brief employment with Grey Wolf, Brooks visited the emergency room at American Legion seeking pain medication. He was advised to see Dr. McKay, who examined Brooks on May 19, 1999. Dr. McKay noted Brooks was experiencing greater distress than on his previous visit *828 and he ordered a lumbar myelogram. The myelogram was performed on May 21, 1997, and revealed a herniated disk. Dr. McKay sought authorization from Capitol and/or its insurance carrier for Brooks to undergo surgery. The authorization was refused.
Dr. Holland reviewed the myelogram and confirmed Brooks was suffering from a herniated disk. Dr. Holland also felt surgery was necessary. On June 6, 1997, Dr. Holland performed the surgery despite the fact that no authorization was given by Capitol or its insurer.
PROCEDURAL HISTORY
|40n March 5, 1997, Capitol filed a disputed claim seeking a declaratory judgment grounded on its allegation that an accident did not occur as claimed by Brooks. Brooks answered and reconvened, filing a claim seeking disability benefits, reimbursement of medical expenses, penalties and attorney’s fees. On August 15, 1997, Capitol filed a third-party claim against Grey Wolf Drilling seeking indemnity and contribution for Brooks’ claim.
Trial on the merits was held on July 28, 1998, and after taking the matter under advisement, the workers’ compensation judge issued oral reasons for judgment on August 19, 1998. Finding in favor of the claimant, the judge held Grey Wolf and Capitol solidarily liable. She found an accident occurred while Brooks was employed at Capitol, and also that Brooks sustained a second accident during the two and one-half week period he was employed by Grey Wolf. Both Capitol and Grey Wolf were ordered to pay Brooks indemnity benefits and all reasonable and necessary medical bills. The workers’ compensation judge also found neither Grey Wolf nor Capitol met their burden of proving they were prejudiced by Brooks’ failure to disclose the prior injury to his back, and denied their respective claims for forfeiture of benefits.[1] The court also awarded Brooks $5,000.00 in attorney’s fees, a $2,000.00 penalty for Capitol’s failure to authorize the surgery, and a $2,000.00 penalty for Capitol’s failure to pay indemnity benefits. The attorney’s fees and penalties were assessed solely against Capitol and not Grey Wolf.
Capitol lodges this appeal assigning the following assignments of error:
1. The workers’ compensation judge erred in finding Brooks satisfied his burden of proving an accident occurred within the course and scope of his employment with Capitol.
2. The workers’ compensation judge erred in finding Brooks was disabled from January 8, 1997 to April 12, 1997.
| f¡3. The workers’ compensation judge erred by awarding Brooks attorney fees and penalties to be paid by it.
4. The workers’ compensation judge erred by not awarding it complete indemnity for all compensation and medical expenses against Grey Wolf, under the “last injurious exposure” rule.
Grey Wolf also appealed the judgment, asserting the following assignments of error for our review:
1. The workers’ compensation judge erred in rendering a judgment in favor of Brooks against a party he never sued, Grey Wolf.
2. The workers’ compensation judge erred in ordering Grey Wolf to pay compensation benefits for the period prior to Brooks’ employment with Grey Wolf.
3. The workers’ compensation judge erred in finding an accident occurred during Brooks’ employment with Grey Wolf when even Brooks could not identify an accident.
4. The workers’ compensation judge erred in finding no prejudice to Grey Wolf for Brooks’ misrepresentations on his employment application with Grey Wolf.
*829 5. The workers’ compensation judge erred in not applying the $750.00 limit to medical expenses accrued before Grey Wolf was even advised of the existence of this claim.
I. Capitol’s Assignments of Error.
La.R.S. 23:1031 requires a workers’ compensation claimant to initially establish “personal injury by accident arising out of and in the course of his employment.” Bruno v. Harbert International, Inc., 593 So.2d 357, 360 (La.1992). An accident, for purposes of workers’ compensation law, is defined in La.R.S. 23:1021(1) as follows:
“Accident” means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
To recover workers’ compensation benefits, a claimant must establish by a preponderance of evidence that an accident occurred on the job site and that an injury |fiwas sustained. Garner v. Sheats & Frazier, 95-39 (La.App. 3 Cir. 7/5/95); 663 So.2d 57. A worker’s testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the circumstances following the alleged incident. Garner, 663 So.2d at 60. Corroboration of the worker’s testimony may be provided by the testimony of fellow workers, spouses or friends, as well as the medical evidence. Bruno, 593 So.2d at 360. The evidence is viewed in a light most favorable to the claimant. When there is proof of an attendant disability, without an intervening cause, it is presumed that the accident caused the disability. Additionally, the trier of fact’s determination as to whether a compensable injury was suffered is a question of fact and will not be disturbed unless manifestly erroneous or clearly wrong. Dew v. V.I.S., Inc., 95-141 (La.App. 3 Cir. 11/2/95); 664 So.2d 693.
Capitol’s defense on this is based primarily on its argument that Brooks was not involved in a work accident because the accident was unwitnessed, Brooks did not complain of the accident until Monday, and sought no medical care the weekend following the alleged mishap. The workers’ compensation judge found Brooks’ actions immediately after the accident were reasonable under the circumstances. The accident occurred twenty minutes before quitting time on a Friday night. The record revealed there were no other shifts that day, and the plant shut down shortly after the 11:00 p.m. shift ended. Brooks testified he was in pain immediately after the accident, and attempted to find his supervisor, Carl Prudhomme, to report the accident. However, he could not find Prudhomme, who testified he is rarely in his office and spends the majority of his work time circling the area he is assigned to oversee at the plant. Brooks testimony that he experienced immediate pain was corroborated by his wife and friend, Scott Miller. When he returned to work on Monday, Brooks reported 17the accident to Carl Prudhomme and the safety director, Mike France. That same day, Brooks went to the emergency room for medical treatment.
Capitol notes Brooks stated, minutes after he fell off the ladder, he told Johnny Andrus that he was looking for Carl Prud-homme to report an accident. At that time Andrus was working for Capitol as a “setup man,” but by the time of trial he was promoted to a supervisor. Andrus did not recall the conversation with Brooks and testified he only learned of the accident one week after it occurred. Carl Prudhomme confirmed Brooks told him about the accident when he returned to work on Monday, but he claimed Brooks also said he did not report the accident earlier because he was not in pain the night of the accident.
*830 The medical evidence produced at trial supports Brooks’ claim that he was injured in the fall on January 3, 1997. Dr. Holland, after examining Brooks on January 23, 1997, suspected he sustained a herniated disk, and ordered an MRI. According to Dr. Holland, he did not believe the MRI showed an “obvious disk herniation,” but noted the MRI was of a “rather poor quality.” Dr. McKay agreed that a MRI on a man the size of Brooks (approximately 300 pounds) would likely be of poor quality.
Because of continuing pain, Brooks went to see Dr. McKay in March for a second opinion. Dr. McKay wanted to perform a lumbar myelogram, but Capitol would not authorize it. Brooks again visited Dr. McKay in May, and a myelogram was performed, which showed clear indications of a disk herniation. Dr. McKay recommended surgery, which was not authorized by Capitol’s compensation carrier. Dr. Holland reviewed the myelogram and previous MRI and also agreed surgery was warranted. Dr. Holland testified the previous MRI, when read along with the mye-logram, indeed did evidence a herniated disk. He testified as follows:
A. Let me clarify. He later had — the MRI, no one was really impressed with his MRI initially. No obvious big disk herniation. Later he worsened considerably, and a myelogram was obtained which was | Rquite impressive. And with that myelogram and the MRI you could see where he did, indeed, have a disk herniation.
Q. Okay.
A. Okay.
Q. Now, let me try to summarize what you said. After you saw the myelogram side-by-side with the MRI, you later could tell by looking at the MRI that there was a disk herniation. Looking at the MRI—
A. Correct.
Q. examination?
A. Correct. It became much clearer that on the MRI he did have a herniation.
Q. Okay. And was another doctor with you at that time when you were—
A. Yes, another physician — a spine surgeon, Dr. Harris, in New Orleans— reviewed all these films.
Q. And what was his interpretation?
A. He’s got a huge herniated disk on both myelogram and MRI.
After a thorough review of the record, we cannot say the workers’ compensation judge was clearly wrong in finding Brooks established by a preponderance of evidence that an accident occurred on the job site on January 3, 1997, and that he sustained an injury. The workers’ compensation judge found Brooks testimony was credible. The medical testimony supported Brooks complaints of pain and need for surgical intervention. We note that Brooks asked Dr. Holland for a release to return to work only five weeks after the surgery was performed. Our review of the record reveals Brooks desire to work was a constant motivator throughout his employment. Even Johnny Andrus testified Brooks was a good, conscientious worker. Brooks’ job security fear and work ethic explain his actions following the accident.
Additionally, we find without merit Capitol’s argument that the workers’ | cicompensation judge erred in finding Brooks was disabled from January 3, 1997 to April 12, 1997. Dr. Holland’s testimony establishes Brooks was injured on January 3,1997.
We also find the workers’ compensation judge did not err in assessing penalties and attorney fees against Capitol for its refusal to pay indemnity and medical benefits. A workers’ compensation judge is afforded great discretion in awarding penalties and attorney’s fees. Miller v. Byles Welding & Tractor Co., 96-164 (La.App. 3 Cir. 6/5/96); 676 So.2d 665. The workers’ compensation judge found *831 Capitol “did nothing but rest on its suit and wait for trial; meanwhile, Brooks and his family suffered.” On the day Brooks reported the accident to Mike France, the safety director, France refused to complete an accident report, and told Brooks to go home. Capitol had an affirmative duty to investigate Brooks’ claim and to ascertain the exact nature of Brooks’ complaints. This was not done, and Capitol was properly assessed penalties and attorney’s fees.

II. Grey Wolfs Assignments of Error.

Grey Wolf contends the workers’ compensation judge erred in finding an accident occurred during Brooks’ employment with it. Grey Wolf points out even Brooks confirmed he was not involved in an accident while in its employ. The term “accident” is defined in La.R.S. 23:1021(1) as follows:
“Accident” means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
(Emphasis added.)
The workers’ compensation judge found, although Brooks could not identify any specific occurrence during his employment with Grey Wolf, an accident occurred | inbecause of the sudden manifestation of his injury. We find the record does not support this finding. Brooks testified repeatedly that he was experiencing continued pain since his injury at Capitol and did not injure himself while working at Grey Wolf:
Q: Is it your testimony today and remains your testimony that you did not injure yourself at Grey Wolf?
A: Yes, sir.
Q: You did not, at any time, report to anyone at Grey Wolf that you had ever injured yourself at Grey Wolf?
A: No.
Q: And you have not, at any time, made any claim or contacted anyone at Grey Wolf seeking to make a claim for any injury on the job?
A: No.
Q: Before you did go to work with Grey Wolf, you were hurting?
A: Yes, sir.
Q: And where were you hurting?
A: In my back and in my left leg.
Q: You were never, at any time prior to going to work for Grey Wolf, free from that pain?
A: Say it again.
Q: You were never — you were never, at any time before you went to work for Grey Wolf, pain free? Do you understand the question?
A: Meaning that I wasn’t hurting before — before I went to Grey Wolf? No. I was hurting before I went to Grey Wolf.
Q: Okay. And that was in the low back and down into your left leg?
A: In my left leg, shocking pain.
Dr. McKay recommended the performance of a myelogram in March when he first examined Brooks, but Capitol refused to pay for it. The recommended myelo-gram was not performed until May, 1997. This myelogram positively revealed Brooks’ herniated disk. The workers’ compensation judge noted Brooks’ pain Inworsened after working for Grey Wolf, and that Dr. McKay felt Brooks’ condition significantly changed between the first office visit in March, 1997, and the second office visit in May, 1997. However, Dr. Holland testified the MRI performed on January 23, 1997, when read along with the later myelogram, clearly evidenced the presence of a herniated disk. Dr. McKay did not dispute Dr. Holland’s conclusion that the disk condition existed prior to Brooks’ employment with Grey Wolf.
While Dr. McKay testified Brooks’ work at Grey Wolf could have aggravated his pre-existing condition, he agreed numer *832 ous other factors could have aggravated it as well, including “sleeping in the wrong position, sitting too long, a long car ride, or simply sneezing.” Dr. McKay admitted any conclusion that Brooks’ disk condition was worsened by his work at Grey Wolf was “mere speculation.” Capitol did not present any evidence to show Brooks was involved in a second accident or that his condition would not have gradually worsened over time but for his employment at Grey Wolf.
We also note, the workers’ compensation judge found Brooks became temporarily totally disabled on January 3, 1997, after the accident at Capitol. This is a clear finding that the disability manifested itself over three months before Brooks began working for Grey Wolf. There was no testimony in the record that Brooks’ disability ever abated, and Brooks testified he could only perform the duties at Grey Wolf while on heavy doses of pain killers.
For these reasons, we find the record does not support the judge’s ultimate finding that Brooks sustained a second accident in April, 1997, while employed by Grey Wolf. Thus, we must reverse that part of the judgment casting Grey Wolf solidarity liable for Brooks’ indemnity benefits and medical expenses. This renders moot Grey Wolfs remaining assignments of error.
|12DECREE
For the foregoing reasons, the portion of the judgment of the Office of Workers’ Compensation finding Grey Wolf Drilling solidarity liable for Timothy Brooks’ indemnity benefits and medical expenses is reversed. In all other respects the judgment is affirmed. Costs of this appeal are assessed against Capitol Manufacturing Company.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

. Only Grey Wolf on appeal assigned as error the judge's ruling on this issue.