971 So.2d 354 (2007)
OUR LADY OF the LAKE REGIONAL MEDICAL CENTER
v.
Claudette MATTHEWS.
No. 2006 CA 1584.
Court of Appeal of Louisiana, First Circuit.
September 26, 2007.
*356 Anthony P. Palermo, Breazeale, Sachse & Wilson, LLP, Baton Rouge, LA, for Plaintiff/Defendant-in-Reconvention/Appellee Our Lady of the Lake Regional Medical Center.
Lee W. Rand, New Orleans, LA, for Defendant/Plaintiff-In-Reconvention/Appellant Claudette Matthews.
Before PARRO, GUXDRY, and McCLENDON, JJ.
PARRO, J.
A former employee appeals from a judgment of the Office of Workers' Compensation Administration (OWC),[1] which declared that she was no longer entitled to continued workers' compensation benefits and dismissed her disputed claim for benefits. For the following reasons, we affirm.

Facts and Procedural History
On October 3, 2001, Claudette Matthew stuck her finger with a needle while drawing blood from an AIDS patient during her employment as a phiebotomist for Our Lady of the Lady Regional Medical Center (OLOL). Subsequently, OLOL voluntarily began to pay workers' compensation benefits to Mrs. Matthews in connection with an alleged resulting mental injury.
On March 31, 2005, OLOL filed a petition seeking to have the OWC determine if Mrs. Matthews had recovered from the 2001 Injury such that she was no longer disabled as a result of her injury. In her answer, Mrs. Matthews filed a reconventional demand, alleging that she was permanently totally disabled as a result of the 2001 incident. In addition to workers' compensation benefits, Mrs. Matthews sought penalties and attorney fees. Subsequently, OLOL petitioned the OWC to have Mrs. Matthews undergo an independent medical examination by an appointed physician. OLOL's motion was opposed by Mrs. Matthews. Prior to trial, the parties stipulated that Mrs. Matthews was presently afflicted by a psychiatrically disabling condition as diagnosed by various psychiatrists in accordance with DSM criteria. Thus, the issue presented was one of causation.
Following the trial of this matter, the workers' compensation judge (WO) found that Mrs. Matthews failed to prove by clear and convincing evidence that her physical injury caused her mental injury, in that her post-traumatic stress disorder and depression preexisted the 2001 incident. The WCJ further declared that the needle stick accident did not exacerbate her preexisting mental condition. From the judgment dismissing her claim for continued workers' compensation benefits, Mrs. Matthews appealed, contending that the WO erred in (1) finding that, prior to the 2001 incident, she experienced and was disabled by the following conditions: schizoaffective disorder, panic disorder with phobias, post-traumatic stress disorder, and depression; (2) failing to find that the accident exacerbated or aggravated her preexisting condition rendering her disabled; (3) placing the burden of proof on Mrs. Matthews, as she was not the plaintiff; (4) failing to give greater weight to the testimony of her treating physicians than to Dr. Rennie Culver who personally evaluated her at OLOL's request on one occasion; (5) ignoring the stipulation relative *357 to the testimony of her son regarding her mental status; (6) failing to find that she had satisfied her burden of proving causation by clear and convincing evidence of the disabling psychiatric condition or an exacerbation or aggravation of the preexisting psychiatric condition; and (7) giving any consideration to the testimony of Dr. Culver.

Discussion
In order for a claimant to recover benefits under the workers' compensation law, he or she must prove that he or she has suffered a personal injury as a result of a work-related accident and that the injury has rendered him or her either temporarily totally disabled, permanently totally disabled, and/or permanently partially disabled, or entitled to supplemental earnings benefits. Alfred v. Mid-South Machine, Inc., 594 So.2d 937, 939 (La.App. 3rd Cir.1992); see LSA-R.S. 23:1021, 1031, and 1221.
In this case, Mrs. Matthews contends she suffered a mental injury caused by a work-related physical injury, producing a disability which prevents her from engaging in any gainful employment. Compensation for a mental injury resulting from a work-related accident producing physical injury is governed by LSA-R.S. 23:1021(8)(c),[2] which states in pertinent part:
A mental injury or illness caused by a physical injury to the employee's body shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence.
Thus, where a mental Injury or illness develops secondary to a physical injury sustained in a work-related accident, a claimant is entitled to workers' compensation benefits for any disability resulting from the mental injury or illness and to reimbursement for medical expenses for treatment of the mental injury. Charles v. South Cent. Industries, 96-0883 (La.11/25/96), 683 So.2d 706, 708. In order to prevail, a claimant must prove by clear and convincing evidence that the physical injury caused the mental injury. LSA-R.S. 23:1021(8)(c). Further, the mental injury must be diagnosed by a licensed psychiatrist or psychologist, and the diagnosis must meet the most current criteria established by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. LSA-R.S. 23:1021(8)(d); Charles, 683 So.2d at 709.
Although compensation laws are to be construed liberally in the claimant's favor, the claimant's burden of proof is not relaxed. Charles, 683 So.2d at 709. To prove a matter by clear and convincing evidence means a party must demonstrate that the existence of a disputed fact is highly probable, much more probable than its nonexistence. Bundren v. Affiliated Nursing Homes, Inc., 94-808 (La.App. 3rd Cir.2/1/95), 649 So.2d 1177, 1179. Disability can be proved by medical and lay testimony. The factual determination by the WO as to whether the claimant has discharged his or her burden of proof should not be disturbed on review absent manifest error. Charles, 683 So.2d at 709. A reviewing court must analyze claimed disability caused by mental conditions with utmost caution in view of the nebulous characteristics of mental conditions and *358 the possibility of symptoms being easily feigned. Westley v. Land & Offshore, 523 So.2d 812, 813 (La.1988); see Williams v. Regional Transit Authority, 546 So.2d 150, 158 (La.1989).
The record indicates that Mrs. Matthews was violently raped on or about June 5, 1997. After this traumatic event, Mrs. Matthews suffered with psychiatric problems for which she had to be hospitalized several times. She had not been hospitalized for her psychiatric condition during the two-year period before being stuck by the needle. According to the Matthewses, prior to the 2001 needle stick, Mrs. Matthews had been working and caring for her family. Although she suffered from a history of depression, Mrs. Matthews urged that she did not have a prior history of visual hallucinations or extreme psychotic behavior. According to the Matthewses and Dr. James B. Denney, a psychiatrist, Mrs. Matthews' symptomatology changed after she was stuck by the needle in that her hallucinations now related to the AIDS patient. Mrs. Matthews argued that this change gave rise to a presumption of causation as to an aggravation and acceleration of her preexisting condition. Thus, she urged that she proved that her disability presumably resulted from the accident.
The medical records that were introduced at trial show an extensive medical history. Mrs. Matthews was first seen by a doctor at Ochsner Clinic Foundation (Ochsner) on June 24, 1997, for depression, back pain, and left shoulder pain. At that time, she complained of being depressed and of a lack of sleep, energy, and appetite. These conditions were related to the rape which had occurred on June 5, 1997. After being discharged from Northshore Psychiatric Hospital, she again sought treatment on August 1, 1997, at Ochsner for weight gain, bloating, swelling of her extremities, neck pain, back pain, and insomnia, at which time she related that she was hearing voices. Subsequently, Mrs. Matthews began receiving treatment from Dr. Denney for the mental injuries that she sustained as a result of the rape while continuing to seek treatment at Ochsner for her resulting physical and mental injuries. She was hospitalized multiple times in 1998 because Of depression and suicidal intentions.
On December 3, 1998, Mrs. Matthews saw Dr. R. Paul Guilbault, III at Ochsner and complained of headaches and continued problems with her lower back and depression. She reported having difficulty doing daily activities and spending time with and showing affection for her family. As of March 8, 1999, she reported that she continued to have lower back pain and a lot of depression on a daily basis and was having difficulty getting herself to do anything. Dr. Guilbault opined that the depression was the main underlying cause of her lower back pain. Dr. Guilbault's notes reflect that within the past month, Mrs. Matthews had been hospitalized in two different psychiatric units.
From March 11, 1999, to March 24, 1999, Mrs. Matthews was hospitalized at Washington-St. Tammany Regional Medical Center's Psychiatric Acute Care Unit for major depression with psychotic features and suicidal plans. The presence of auditory hallucinations was noted. Dr. Sidney C. Strickland's diagnosis was schizoaffective disorder. According to Dr. Stickland, Mrs. Matthews was experiencing hallucinations and was psychotic with severe suicidal ideations.
During an Ochsner visit with Dr. Guilbault on May 6, 1999, Mrs. Matthews voiced a fear of being out in public on her own because she was scared of running into people who are aware of her rape and possibly being attacked again while alone. *359 On January 14, 2000, Mrs. Matthews saw Dr. Guilbault, complaining of an increase in her level of depression following reports of rapes in New Orleans. Since her mental condition did not appear to be Improving, Dr. Guilbault felt that she was a candidate for electro convulsive therapy. On February 7, 2000, Dr. Denney noted that Mrs. Matthews had delusions and hallucinations related to post-traumatic stress disorder. She was prescribed Risperdal, an anti-psychotic medication, for paranoid thinking and hallucinations at that time.
On January 17, 2001, Dr. Denney noted that Mrs. Matthews was suffering with increased flashbacks and nightmares about the rape. In April 2001, Dr. Denney noted that Mrs. Matthews suffered an increase in post-traumatic stress disorder symptoms, including flashbacks, intrusive thoughts, and sleeplessness as a result of having met the man who raped her. Mrs. Matthews had regressed and was more symptomatic. She reported that she felt like people were watching her and that she was hearing things, i.e., someone walking in her home.[3] The May 10, 2001 records from United Behavioral Health refer to the onset of panic attacks triggered as a result of her rapist returning to town.
On August 28, 2001, Dr. Denney noted that Mrs. Matthews was possibly suicidal. By September 18, 2001, Dr. Denney felt that the presence of Mrs. Matthews' suicidal thoughts warranted contact with the police. Medical records of Dr. Denney indicate that in September 2001, Mrs. Matthews was lethargic, depressed, and anxious. Nonetheless, Dr. Denney noted that she did not have any distortions or delusions, except for the post-traumatic stress disorder type of symptoms, or any hallucinations or allusions, except from "flashback phenomena," which in his opinion were not truly hallucinations in the clinical sense. Based on his assessment, Dr. Denney believed that Mrs. Matthews was possibly suicidal and recommended that she be hospitalized. According to Dr. Denney, this recommendation was based on the fact that she was extremely over-medicated.
On September 27, 2001, Mrs. Matthews was seen by Dr. Guilbault at Ochsner for an exacerbation of her neck and back pain due to an August 27th motor vehicle accident. Mrs. Matthews reported that she had been having a lot of pain in her low back that radiated down into her right leg into her calf. She explained that at that time, her right foot felt cold and her right leg gave out. Mrs. Matthews informed Dr. Guilbault that she had experienced an increase in her depression due to the pain. Dr. Guilbault noted that she was very depressed and was suffering from hopelessness. She also reported that she felt that she was becoming a severe burden on her family and that she had been forced to stop working because of the automobile accident. At that time, Dr. Guilbault thought that Mrs. Matthews needed to be hospitalized as she was suffering from major depression. Mrs. Matthews was opposed to being hospitalized, as she did not feel that it had helped her In the past and she did not want Dr. Guilbault to relate his concerns to Dr. Denney.
The following day, September 28, 2001, Dr. Denney noted that Mrs. Matthews was non-complaint. She refused to be hospitalized and declined electroconvulsive therapy treatment. Dr. Denney terminated his care of Mrs. Matthews by letter dated October 16, 2001, as a result of her being verbally abusive and threatening to his *360 staff and her failure to comply with her medication contract.
When Dr. Denney next saw Mrs. Matthews on December 17, 2001, he noted her history of being non-compliant with treatment and medication plans and not following his recommendations. Following the needle stick, Dr. Denney did not feel comfortable treating Mrs. Matthews as she had become so psychotic that she would not comply with anything. On that date, she was admitted to Northshore Psychiatric Hospital with a major depressive disorder with psychotic features. Dr. Denney terminated his care of Mrs. Matthews a second time pursuant to a letter dated January 10, 2002, as a result of her non-compliance and verbal abuse of his staff.
Concerning his treatment of Mrs. Matthews, Dr. Denney testified that Mrs. Matthews had significant preexisting psychiatric difficulties following the 1997 rape. His original diagnosis was post-traumatic stress disorder. He felt that she made modest progress, in that she got well enough to go back to work. In Dr. Denney's opinion, although Mrs. Matthews was not symptom free prior to the needle stick, she was functioning marginally at work and home. According to Dr. Denney, the needle stick significantly changed her symptomatology, mental condition, and functioning level, pushing her over the edge. Dr. Denney's post-needle stick diagnosis was major depression with psychotic features.
At her January 24, 2002 appointment at Ochsner, Mrs. Matthews discussed the needle stick incident and her subsequent treatment. Mrs. Matthews explained that she injured her knee as a result of banging it on the side of the table when she was stuck by the needle. She also complained of continued back pain. She admitted to having a lot of anxiety due to her back pain, as well as her concern about HIV.
Because Dr. Denney refused to continue to treat Mrs. Matthews, she began receiving treatment from Dr. Alan Coe on February 27, 2002. Dr. Coe's diagnosis of Mrs. Matthews' condition was schizoaffective disorder and panic disorder with phobia. Dr. Coe noted that Mrs. Matthews was suffering from delusions and that her thinking and logic were faulty. Mrs. Matthews reported a disturbance of her affect or moods, a lot of tearfulness, depression, and apathy, inability to cope or enjoy herself, sleep disturbance, suicidal ideation, a good deal of paranoia, and some hallucinations. Dr. Coe was not sure what Mrs. Matthews' functioning level was prior to February 2002; however, it was his understanding that she was a lot more functional before the needle stick, in that she had held a job for a period of six to eight months.[4]
Dr. Coe testified that he did his best in attempting to review the medical records of Dr. Denney, whose writing was "pretty much illegible" except for some letters. According to Dr. Coe, Dr. Denney treated Mrs. Matthews mostly for depression. Nothing in his review of Dr. Denney's records made Dr. Coe believe that Dr. Denney saw any of the seriousness of what he saw, that is, delusions, hallucinations, and psychosis, until December 2001. Dr. Coe explained that post-traumatic stress disorder is not a psychotic diagnosis, which is an anxiety disorder in reaction to a traumatic event. Although Mrs. Matthews experienced some waxing and waning over the course of Dr. Coe's treatment of her,[5] *361 Mrs. Matthews' condition did not improve much. The only stressor related to Dr. Coe by Mrs. Matthews was the needle stick.[6] Dr. Coe explained that the majority of Mrs. Matthews' delusions and visions centered on the stick incident. She reportedly had visions of the needle and conversations with people who did not exist who told her that she had HIV or things of that nature. These things were the central theme of a delusional system, as opposed to facts surrounding the assault or the perpetrator. Dr. Coe believed that Mrs. Matthews' reports of seeing things were credible.
Notably, at a follow up appointment on March 27, 2002, at Ochsner for her back and neck pain related to at least two automobile accidents and perhaps other injuries, Mrs. Matthews reported that although she was still seeing a psychiatrist at that time, she was off all of her psychiatry medications except Klonopin. After considerable improvement, her psychiatric status was noted as being stable. On May 22, 2002, Mrs. Matthews saw Dr. Guilbault at Ochsner for treatment of chronic problems with her neck, left knee, and lower back pain. Mrs. Matthews denied any depression and reported that she was off of her depression medication.
Pursuant to OLOL's request for a second medical opinion, Mrs. Matthews was examined for approximately three-and-a-half hours by Dr. Rennie Culver, a psychiatrist. In connection with his examination, Dr. Culver had reviewed the records of all of the various medical providers who treated Mrs. Matthews, including those of Drs. Coe and Denney. His diagnosis of Mrs. Matthews' condition was psychotic (delusional) and depressed (psychomotor retardation/vegetative signs of depression). This diagnosis was based on her reports of having had hallucinations involving the AIDS patient and believing the following: that she had AIDS in the absence of any objective evidence, that God had revealed to her that she had AIDS, and that she was lied to and deceived by those that said that the HIV tests had repeatedly been negative. Despite all of the references to things related to the needle stick, Dr. Culver opined that Mrs. Matthews' current mental condition was not related to the needle stick. The following factors led him to the conclusion that her condition was preexisting: (1) she had ideas of reference, symptoms of psychosis, and depression for years, (2) she had been in and out of psychiatric hospitals, and (3) schizophrenia is a "heredity disease."[7]
According to Dr. Culver, the needle stick resulted in an exacerbation of her condition in that it temporarily caused some degree of anxiety. Nonetheless, she had a long history of paranoia, delusions, and non-compliant behavior regarding the taking of prescribed medications. According to Dr. Culver, the needle stick is only one of the things that she was delusional about. Dr. Culver explained that when a patient is paranoid and is subject to delusional thinking, anything that happens to the patient, even the most innocuous things, can be incorporated into the delusional system, which may be fixed and encapsulated but they also tend to spread.[8]
Although the evidence suggests that the WCJ may have failed to note that *362 the needle stick incident temporarily exacerbated or aggravated her preexisting mental condition,[9] we are unable to find that the WO manifestly erred in finding that Mrs. Matthews failed to prove by clear and convincing evidence that her current mental condition was causally related to the 2001 needle stick.[10] Nor are we able to conclude that in so finding, the WCJ ignored the stipulation relative to the testimony of Mrs. Matthews' son. Although the needle stick became at times central to her delusions, the evidence in the record reflects that the following additional factors had an impact on Mrs. Matthews' mental condition and her tendency to overmedicate during the time period in question: the 1997 rape, reports of rapes in New Orleans, meeting her rapist who was back in town, the physical Injuries suffered from at least two separate automobile accidents, the pregnancy of her 16-year-old daughter in the beginning of 2002, and her inability to get her paycheck straightened out around April 4, 2002.
The evidence as a whole supports the position that the depression experienced by Mrs. Matthews in March 1999 was with psychotic features and suicidal plans. At that time, she was having auditory hallucinations. Dr. Strickland's diagnosis of Mrs. Matthews' condition in March 1999 was schizoaffective disorder, the same as that of Dr. Coe on February 27, 2002. Dr. Coe's diagnosis also included panic disorder with phobia. Notably, Mrs. Matthews had also experienced panic attacks for one reason or another prior to the needle stick. When questioned about Dr. Stickland's 1999 diagnosis of schizoaffective disorder, Dr. Denney denied that Mrs. Matthews was schizoaffective at that time. Dr. Denney instead opined that she had experienced bipolar spectrum or major depression with psychotic features. However, *363 because of the delusions and hallucinations that Mrs. Matthews was experiencing in February 2000, Dr. Denney prescribed Risperdal. Furthermore, the March and May 2002 Ochsner medical records, which indicated that Mrs. Matthews' psychiatric status was stable and that she was no longer taking medication for depression, contradicts Dr. Coe's testimony that Mrs. Matthews' condition did not improve much while he was treating her.
Given the totality of the evidence presented, and in light of Mrs. Matthews' burden to establish by clear and convincing evidence that her mental injury was caused by the October 3, 2001 needle stick, we are unable to find that the WO erred. See LSA-R.S. 23:1021(8)(c).

Decree
For the foregoing reasons, the judgment of the Office of Workers' Compensation Administration is affirmed. Costs of this appeal are assessed to Claudette Matthews.
AFFIRMED.
GUIDRY, J., dissents and assigns reasons.
GUIDRY, J., dissenting.
Although Mrs. Matthews had pre-existing symptoms of paranoia and delusions, the medical evidence, particularly the testimony and records of Dr. Denney, establish that prior to the needle stick incident, the primary medical concern was depression with suicidal ideation; however, following the needle stick incident, the medical evidence establishes that her symptoms of paranoia and delusions escalated and were the primary focus of medical concern. Further, Dr. Culver acknowledged that there was an exacerbation of Mrs. Matthews' symptoms, and while he opined that the exacerbation was of no meaningful duration, he failed to address the specific medical evidence demonstrating that the nature and intensity of Mrs. Matthews' mental illness had changed following the needle stick incident. The evidence also; establishes that at the time of the needle stick incident, Mrs. Matthews' mental condition was sufficient for her to function in employment and at home, but following the incident she was uniformly found to be unemployable due to her mental condition.
Hence, I believe that Mrs. Matthews established by clear and convincing evidence that her pre-existing mental condition was exacerbated by the needle stick incident and was thus compensable. I therefore respectfully dissent from the majority's opinion affirming the judgment denying Mrs. Matthews' claim.
NOTES
[1] Honorable Robert W. Varnado, Jr. of District 6 presided in this matter.
[2] At the time of the accident, the applicable provision was found in paragraph (7); however, pursuant to the statutory revision authority of the Louisiana State Law Institute, paragraph (7) was redesignated as paragraph (8) In 2004. We will refer to paragraph (8) In this opinion.
[3] Mrs. Matthews was involved in a minor motor vehicle accident one week prior to May 2, 2001, reportedly producing increased neck and back pain, as well as bilateral shoulder pain and bilateral hip pain.
[4] Dr. Coe's understanding to this effect was supported by the testimony of Mr. Matthews, as well as the stipulated testimony of the Matthewses' son.
[5] Dr. Coe has seen Mrs. Matthews continuously since February 2002, every one to two weeks.
[6] Mrs. Matthews and her family members related the onset of her symptoms to the needle stick incident.
[7] This belief was echoed by Dr. Coe, who testified that schizophrenic disorders are likely a biological illness in that they were there all the time in some fashion or another.
[8] As stated by Dr. Coe, a patient's schizophrenic disorder is affected by his environment and experiences.
[9] A workers' compensation claimant is entitled to benefits for the aggravation of a preexisting mental disorder only as long as the aggravation continues. Fuselier v. International Maintenance Corp., 94-792 (La.App. 3rd Cir.2/1/95), 649 So.2d 1197, 1202.
[10] Mrs. Matthews challenges the WCJ's placement of the burden of proof on her in light of her position as a defendant in the initial suit for declaratory judgment brought by OLOL. As previously stated, the law places the burden of proof on the person seeking to recover workers' compensation benefits. See LSA-R.S. 23:1021, 1031, and 1221. The voluntary payment of workers' compensation benefits does not constitute an admission of liability on the part of the employer. LSA-R.S. 23:1204. If the employer chooses this route, the employee is then prohibited from litigating the issue. Section 1204 fosters the humane policies underlying the workers' compensation statutory framework by encouraging voluntary payments to a legitimately injured employee. Snelling Personnel Services v. Duhon, 00-661 (La.App. 3rd Cir.11/2/00), 772 So.2d 350, 353.

In the absence of a judgment ordering OLOL to pay benefits, OLOL was free to discontinue payment of benefits at any time, unless such discontinuance was arbitrary or capricious. See former LSA-R.S. 23:1201.2 (repealed by 2003 La. Acts, No. 1204, § 2-see, current LSA-R.S. 23:1201(I)). At such time, Mrs. Matthews would have been required to file a disputed claim for compensation with the OWC to obtain a determination of her entitlement to workers' compensation benefits. See LSA-R.S. 23:1310(A). In such an action, the burden of proof would have been on her. The fact that OLOL voluntarily paid benefits and commenced this action rather than simply discontinuing the payment of benefits does not relieve Mrs. Matthews of this burden, especially when considering that she reconvened by filing a disputed claim for compensation. See Snelling Personnel Services, 772 So.2d at 353; see also Capital Mfg. Co. v. Brooks, 99-267 (La.App. 3rd Cir.11/3/99), 745 So.2d 825, 830, writ denied, 99-3411 (La.2/4/00) 754 So.2d 236. To find otherwise would discourage an employer from paying voluntarily out of fear that doing so would lead to claimants being presumptively entitled to benefits. Snelling Personnel Services, 772 So.2d at 353.