ROSEMARY LEDET, Judge.
| tThis is a workers’ compensation case. Remco Leidelmeijen filed a disputed claim for compensation against his former employer, Ferncrest Manor Nursing Home (“Ferncrest”), and Ferncrest’s workers’ compensation carrier, LUBA Workers’ Comp. (“LUBA”) (collectively “Defendants”). The- parties, settled Mr. Leidel-meijen’s claim for indemnity benefits and tried his claim for medfcal benefits.
The Workers’ Compensation Judge (“WCJ”) adopted the expert opinion of two neuropsychologists who diagnosed Mr. Leidelmeijen. with malingering. Based on the malingering diagnosis, the WCJ found that Mr. Leidelmeijen failed to meet his burden of proof, as to entitlement to medical benefits-and that-any and all entitlement to benefits in this matter was terminated as of May 29, 2013 — the date on which he first underwent neuropsychological testing with Defendants’ choice of neu-ropsychologist, Dr. Megan Ciota., From that decision, Mr. Leidelmeijen appeals. For the reasons that follow, we affirm.
I {.FACTUAL AND PROCEDURAL BACKGROUND
This matter arises out of an unwitnessed accident that occurred on November 11, 2008. On that date, Mr. Leidelmeijen was yrorking for Ferncrest. as a licensed practical nurse. According to Mr. Leidelmei-jen, he went into a patient’s bathroom to empty a catheter bag and slipped on water that was on the floor. He fell forward, hitting his face and jaw on the sink. He then fell backwards, hitting the back of his head on the floor. As a result, Mr. Leidel-meijen allegedly injured his head and his mouth (teeth). He declined a request to eall an ambulance; instead, he went home from work that day with a family member. ■Later that day, he went to the emergency room', where he was treated and released. According to the emergency room records, he was treated for a head trauma at work. He denied loss of consciousness, and it was *42 noted that his front teeth were loose.[1]
About one week after the accident, Mr. Leidelmeijen was taken to the hospital by-ambulance for a seizure. He was treated in the emergency room and released. Thereafter, he allegedly continued to experience seizures. During such seizures, he allegedly injured, among other things, his teeth. For his teeth, Mr.' Leidelmeijen was treated by David Hildebrandt, D!D.S., a dentist. For his seizures, Mr. Leidelme-ijen was treated by Dr. Michael Mitchell, a neurologist. Both Dr. |sMitchell and Dr. Hildebrandt treated Mr. Leidelmeijen on a regular basis from 2008 through the date of the trial.
During the years after the accident, Mr. Leidelmeijen has attributed multiple physical and mental problems to the accident. For these problems, Mr. Leidelmeijen has seen a myriad of doctors who have prescribed a myriad of medications. Mr. Lei-delmeijen has not returned to work. Defendants have paid him both indemnity and medical benefits.
On September 4, 2013, Mr. Leidelmeijen first filed a disputed claim for compensation against Defendants based on their failure to authorize dental work recommended by Dr. Hildebrandt. Ón Séptem-ber 17, 2013, Mr. Leidelmeijen filed an amended disputed claim based on Defendants’ denial of a MRI and blood work recomttiended by Dr. James Denney, his treating' psychiatrist, and Dr. Paul Hub-bell, his pain management doctor.[2] On March 16, 2105, Mr. Leidelmeijen filed a second amended disputed claim based on Defendants’ “[f]ailure to pay the Injured Workers’ Pharmacy (ÍWP).” In all of his petitions, he requested penalties and attorneys’ fees. Defendants answered the petitions generally denying the allegations and asserting various defenses, including the $750.00 cap on unauthorized, nonemergen-cy care provided for in La. R.S. 23:1142(B).
|4In December 2013, the trial court approved a joint compromise between the parties, which settled Mr. Leidelmeijen’s claims for indemnity benefits and reserved “all claims for medical benefits .stemming from the subject accident.”[3]
In- June 2014, Defendants filed a Motion to Compel Second Medical -Opinion (“SMO”) in the field of, neurology. Defendants, argued that the SMO was necessary because Mr. Leidelmeijen “maintains that he is experiencing seizures related to the subject work accident despite the fact that there is little or no objective evidence of claimant experiencing any. seizures.” In support, Defendants noted that they had Mr. Leidelmeijen evaluated by a neuropsy-chologist of their choice, Dr. Ciota, and that Dr. Ciota stated the following in her report:
There is no objective evidence that Mr. Leidelméijen has a seizure disorder other thhn his self-reported episodes allegedly witnessed by his daughter. Furthermore, records reference that EEG examinations have been .negative. Development of seizures is not a typical outcome- following a mild head injury. *43 There is a strong indication of psychological overlay with regard to physical symptom presentation to the extent that somatic malingering is strongly suggested. .
Given that Dr. Ciota was not a neurologist, Defendants requested a SMO by a-neurologist of their choosing, Dr. Daniel Trahant. In July 2014, the trial court granted Dé-fendant’s Motion to Compel Second SMO and ordered that' Mr. Leidelmeijen be examined by Dr. Trahant. • ’
In his July 2014 report, Dr.- Trahant stated h'is finding of his examination -as follows:
The exact nature of his [Mr. Leidel-meijen’s] head injury is unclear, though I do suspect a psychogenic component at play here, Rbased on his affect, overall presentation in the office, and .mode 'of performance during the interview-and examination. Certainly, in this instance, neuro-psychological testing would be of extreme importance in qualifying and quantifying any organic residual from a head injury from that on. a psychogenic or emotional basis.
He also possibly has seizures, though I do not have results of any MRI of the brain or EEG studies_
This is a quite difficult case to assess.
In a subsequent report dated September 2014, Dr. Trahant, based on his review of Dr. Mitchell’s deposition and Dr. Andrews’[4] and Dr. Ciota’s reports, further stated:
[I]t is my opinion that more likely than not Mr. Leidelmeijen is having psychogenic seizures. I do not believe the type of head injury he experienced is sufficient enough to cause a seizure disorder. His neuropsychological testing per Dr. Megan Ciota is of the opinion that Mr. Leidelmeijen is malingering. ¡.■.(The opinion of Dr. Susan Andrews stresses “an. overall context of psychiatric problems, which are exacerbating the situation.” In addition, he has had two - EEGs with [sic] did not reveal any epi-leptogenic discharges.
I do agree with Dr. Michael Mitchell filthat inpatient EEG monitoring would be the gold standard in such a case, but it is my understanding that Mr. Leidelmei-jen has refused such testing.
In October 2014, Defendants filed the •following two motions: '■(i)-a Motion to Compel Inpatient Multi-Day Electroencephalogram (“EEG”) Testing; and (ii) a Motion' to Appoint IME in the field of neuropsychology. The purpose of the inpatient EEG testing was to determine the cause of the alleged seizures.[5] The purpose of the IME was to obtain an opinion ■regarding whether Mr. Leidelmeijen was malingering in a clinical sense.' In support of this motion, Defendants pointed out that a dispute existed between Defendants’ and Mr. Leidelmeijen’s experts in | ^neuropsychology and clinical psychology — Dr. Ciota and Dr. Andrews, respectfully — on the malingering issue and that this was a matter “ripe for a court appointed IME to address and resolve the dispute.” Defendants further pointed out that the issue of malingering is significant since there is no objective evidence that Mr. Leidelmeijen is actually having seizures.
Over Mr. Leidelmeijen’s objection, the trial court granted both of Defendants’ motions, ordering the inpatient EEG testing and the appointment of an IME in neuropsychology. See La. R.S. 23:1123; La. R.S. 23:1124.1. The trial court appointed Dr. Paul Dammers as its IME in *44 neuropsychology. In March 2015, Dr. Dammers examined Mr. Leidelmeijen and reviewed a plethora of medical records. Agreeing with Dr. Ciota, Dr. Dammers diagnosed Mr. Leidelmeijen with malingering. In April 2015, Mr. Leidelmeijen underwent the inpatient EEG testing; the results of that testing were negative.
In the trial court, Mr. Leidelmeijen cab-ined his disputed claim to the expenses related to treatment of his seizures, broken teeth, temporomandibular joint disorder (“TMJ”), and mental health and the related prescription expenses.[6] |7The parties stipulated that the indemnity portion of this claim has settled; that what is left is a medical only claim; that Mr. Leidel-meijen was an employee of Ferncrest on November 12, 2008;[7] that Mr. Leidelmei-jen reported a work accident while in the course and scope of his employment on that date; that on that date, Ferncrest had a policy of workers compensation insurance with LUBA in place. The parties submitted the matter to the WCJ on briefs and joint exhibits. ■ '
The joint exhibits included over three thousand pages of medical records and expert depositions. The depositions of the following eight experts were included in the record: two -neurologists — Dr. Mitchell (Mr. Leidelmeijen’s), and Dr. Trahant (Defendants’); three neuropsychologists— Dr. Andrews (Mr. Leidelmeijen’s), Dr. Ci-ota (Defendants’), and Dr. Dammers (the court-appointed IME); two dentists — Dr. Hildebrandt (Mr. Leidelmeijen’s), and K. -Richard DuBois, DDS (Defendants’); and one physical medicine and rehabilitation specialist, Dr. Karen Ortenberg. To provide a framework for analyzing the factual issues .presented on this appeal, we briefly summarize the deposition testimony and reports of each of those eight experts. Dr. Mitchell
|sDr. Mitchell, Mr, Leidelmeijen’s treating neurologist, acknowledged the following three possible causes of Mr. Leidelmei-jen’s seizures:
'(i) epileptic seizures, which are caused by some physical problem in the brain;
(ii) psychogenic seizures, which are not caused by any physical problem in the brain, but rather by some psychological issue;[8] and
*45 (iii) malingering, which means that Mr. Leidelmeijen is- not actually having seizures but faking.
Dr. 'Mitchell opined, in his August 2014 deposition, that Mr. Leidelmeijen “suffered an injury in 2008 that has left .him suffering from seizures most likely of either an epileptic or psychogenic cause.” Dr. Mitchell, however, after reviewing the' negative results of the court-ordered inpatient EEG testing done at Ochsner, stated in his May 27, 2015 report- the following:
The patient was admitted for epilepsy monitoring and taken off of all of his AEDs. He had no epileptic discharges or seizures during that ádmission despite provacative [sic] measures with trama-dol/benadryl' and ' sleep deprivation. This is suggestive of either psychiatric pseudoseizures or malingering. There is certainly some secondary gain in this instance. 'I more inclined' to lean to malingering in this patient [sic]. I discussed my opinion with the patient. I will wean his Keppra. I will continue him on Depakote for now. That' may help' some of his mood disturbances. I may consider cutting back on his dose when he returns.
Dr.. Mitchell further noted that “[h]is psychiatrist may . want to keep him on this medication [Depakote] due to mood stabilizing effects.”

Dr. Trahant

Dr. Trahant, Defendants’ neurologist,, in his October 2014 deposition, expressed the following opinion regarding Mr. Leidelmei-jeris seizures:
U think he’s having seizure-like episodes, but I think more likely than not he is having psychogenic seizures. I do feel that the episodes are occurring. , I think the episodes are related to his injury, but I don’t think that these are true seizures related to a brain injury -that he-has suffered to the extent that it caused brain damage to cause seizures. So I don’t think his seizures are organic ’in nature. I think they are non-organic ■ or functional pseudoseizures.-
Dr. Trahant opined that he did “not be-heve' the type of head injury [Mr. Leidel-meijen] experienced is sufficient enough to cause a seizure disorder.” Dr. Trahant explained his opinion that the seizures were psychogenic as follows:
[F]unctional or non-organic, that would be one sub-type, one sub-cause so to speak would be malingering or a eonversion reaction of individual that is actually having seizure-like’episodes, not true seizures in themselves but based on some underlying psychogenic problem that — or psychiatric problem or emotional problem that they’re converting to a seizure.
Dr. Trahant further testified that there was no question that “there’s some underlying psychiatric problems with this individual. I don’t think there’s any question based on both of the neuropsychologist reports that the effort given was not full effort.” He added that his opinion had to be colored and influenced by what the neuropsychologists find.[9]

Dr.. Andrews

Dr. Andrews, Mr. Leidelmeijen’s neu-ropsychologist, examined Mr. Leidelmeijen in'March 2014 on referral from Dr. Den-ney, Mr. Leidelmeijen’s treating psychiatrist. In her report, Dr. Andrews noted that Mr. Leidelmeijen’s “effort is not so' much inconsistent as it is not strong?’ She further noted that “[h]e did not demonstrate the typical behaviors of a malingerer; such as commenting on how hard some *46 thing is or saying he cannot do it.” Her significant findings included | inthat “[t]aken as a group, Mr. Leidelmeijen scored very poorly on measures of frontal lobe function, which include attention and concentration” and that he is “expressing suicidal . ideation,- depression and anxiety.” She concluded that “[h]is neuropsychological profile is consistent with the description of hfe. -injury. and with .his treating physiciaps reports.” In her May 2014 deposition, Dr..Andrews .testified that she did not think Mr. Leidelmeijen was malingering. She explained that she ruled out malingering because “[h]e has too many psychiatric .issues of major proportions, too much chronic pain, too many other factors for [her] to say that he was malingering on this test.” She, however, acknowledged that she did not rule out that he was not giving full effort. She also criticized Dr. Ciota for rendering an. opinion regarding Mr. Leidelmeijen’s seizures, which she noted was outside the scope of Dr, Ciota’s expertise as a neuropsychologist.

Dr. Ciota

Dr. Ciota,. Defendants’ neuropsychologist, testified that she met with Mr. Lei-delmeijen personally on May. 29, 2013,[10] and reviewed his records. His records, she noted, included the reports of two other neuropsychologists who previously had examined him — Dr. Andrew Dickerson in August 2009 and Dr. Andrews in March 2013, Dr. Ciota noted that Dr. Dickerson examined Mr. Leidelmeijen on referral from Dr. Mitchell. She further noted that Dr. Dickerson indicated that Mr. Leidelmeijen performed below chance on- one test and that effort testing was indicative of poor effort, which is associated with picking the wrong answer and intention.[11] Dr. Ciota voiced two criticisms of Dr. Andrews’ report. First, Dr. Ciota | uno ted that Dr. Andrews failed to address in her report Mr. Leidelmeijen’s failures on cognitive symptoms and on validity testing. Second, she noted that Dr. Andrews failed to take into consideration the , kind or severity of Mr. Leidelmeijen’s 2008 injury.
• Dr. Ciota described Mr. Leidelmeijen’s injury as. a. concussion or a “mild” head injury, at worst. She explained that her characterization of his injury was based on the following factors: (i) no loss of consciousness; (ii) regained orientation relatively quickly; (iii) little in the way of amnesia; and (iv) negative findings on the brain imaging. In her report, Dr. Ciota likewise noted that “[t]aken together, [these factors indicate] the patient suffered a mild head injury, i.e., concussion, at worst, if his report of being dazed following a blow to the head is accurate.” Dr. Ciota testified that “[development of seizures is not a typical outcome following a mild head injury” and that “[seizures are not associated with a concussion at worst.” Dr. Ciota explained that mild head injuries are not associated with lasting psychological, cognitive, or physical problems. She concluded that “it’s more probable than not that he’s not having seizures that are related to the 2008 concussion.” - ■
Dr. Ciota’s primary diagnosis of Mr. Leidelmeijen was malingering. She explained that malingering is a clinical term. It is a diagnosis that an individual is exaggerating' or producing symptoms or problems coupled with an inherent, strong secondary gain component. The exaggeration of symptoms, she noted, was the indication of exaggeration on several of the tests of effort and of.validity. - In this-.case, she *47 noted there were multiple indicators of suboptimal effort. Indeed, she commented that in all three areas that neuropsycholo-gists assess — cognitive symptom validity, psychological symptom validity, and physical and. disability [^reporting validity— there were indications of exaggerated responses and poor efforts. Dr. Ciota explained that there were multiple flags with regard to her testing of Mr. Leidelmeijen. The secondary gain factors, she noted, include receipt of compensation. ' '

Dr. Dammers

Dr. Dammers, the court-appointed, neu-ropsychologist, in his May 2015 deposition, defined malingering as follows: “I think the term that most people would relate to would be faking. Essentially, malingering is faking or exaggerating in an effort to receive compensation.” He explained that there is a continuum of clinical malingering — definite, probable, and possible. Dr. Dammers testified that he plaeed Mr. Lei-delmeijen in the category of “probable to definite” malingering. The reason he placed him in that category, he explained, was because “we have consistent evidence of suboptimal motivation and we have some really quite unique behaviors in testing that don’t make any sense,”
Dr. Dammers opined that the head injury Mr. Leidelmeijen suffered was on the low end of even “mild.” He noted two things. First, the injury was not consistent with a disability. Second, Mr. Leidel-meijen had “a lot of baggage” — a premor-bid psychiatric history, including two prior suicidal gestures and a long history of panic attacks. In his report, Dr. Dammers noted that the emergency- room records from the date of the accident “reflect that [Mr. Leidelmeijen] was seen within hours of the alleged accident- and at- that time was completely alert/oriented and in no acute distress; He denied LOC [loss of consciousness] and was reported calm and cooperative.” The emergency room records further reflect that Mr. Leidelmeijen gave a histofy of panic attacks, reflecting a premorb'id psychiatric-history..- Dr. Dam-mers noted that it was impossible for the injury Mr. |1sLeidelmeijen’s sustained in 2008 to cause seizures and that there was no objective indication-of seizure activity.
Dr. Dammers testified that all the testing regarding physical' causes of seizures was negative and that Mr. Leidelmeijen’s Seizures were thus either nónepileptiform (psychogenic) or malingering. " Dr. Dam-mers agreed with the other'doctors’that inpatient EEG testing would be the “gold standard” to determine if Mr. Leidelmei-jen actually had a seizure condition. Commenting on the negative results of the inpatient EEG testing, Dr. Dammers noted that the results were consistent with his opinion that “it would be unheard of'to develop epilepsy as a result of a possible concussion with no loss of consciousness.” Although Dr. Dammers was unwilling to definitively say Mr. Leidelmeijen’s seizures were the result* of malingering, he testified that “when a person shows signs of suboptimal motivation and when a person does not give a valid.history, then you have to question their other signs/ & symptoms as potentially suspect.” Based on Mr. Leidelmeijen’s cognitive studies and psychological presentation, Dr. Dam-mers opined that as .between malingered and psychogenic seizures,- -he “would lean in the direction of malingered.”
Dr. Dammers found it significant that Mr. Leidelmeijen failed to inform him of his 2005 suicide attempt or his prior suicide attempt that occurred ‘ years earlier when he was living in Europe. Dr. Dam-mers testified that this caused him to have concerns about the validity of Mr. Leidel-meijen’s history.
©r. Dammers' also found it significant that Mr. Leidelmeijen had been evaluated *48 by four, neuropsychologist — himself, Dr. Dickerson, Dr. Andrews, and Dr. Ciota. Dr. Dammers testified that the fact there were multiple neuropsychological testing in this case lead him to believe even more strongly in | uhis diagnosis of Mr. Leidel-meijen as malingering. , In his report, Dr. Dammers noted that “there is abundant evidence of poor performance validity, apparently on each of the 4 formal testing evaluations he had undertaken.” Dr. Dammers further noted that “[rjeview of ,§ previous neuropsychological exams revealed clear evidence of exaggerated symptoms and/or .malingering contained in each of these reports (Dickerson, Andrews, Ciota). This is clearly discussed by Drs. Ciota and Dickerson, but curiously absent from discussion by Dr. Andrews.” Dr. Dammers noted that his opinion was that “the most likely explanation for his test findings and current status is malingering.”
Dr. Dammers elaborated on the meaning and significance of the diagnosis of malingering as to Mr. Leidelmeijen’s claim for benefits in this case as follows: ■
Q. So by finding that Mr. Leidelmeijen is malingering, you’re saying that it’s more probable than not that he’s intentionally feigning or exaggerating hjs physical or psychological symptoms for some sort of personal gain?
A. That is correct.
Q. With regard to the diagnosis of malingering, does it cause you to call into question all of his complaints with regard to the subject accident; in other words, the veracity of those complaints? A. Absolutely.
Finally, Dr. Dammers opined that Mr. Leidelmeijen “should not require any continued mental health treatment specifically as relates to the index accident.” In his deposition, Dr. Dammers explained this statement as follows:
I say that because if you go through the history, there’s no reason why he would have any such problems as a result of the index accident. So' therefore, I can’t assign any treatment to the index accident. Certainly others could opine that he has a myriad of psychiatric problems and thus he needs treatment, and I wouldn’t necessarily disagree with that, but I can’t relate it to the accident.
11sDr. Dammers also testified that, in his experience, the only time people cracked their teeth as a result of seizures is when the'individual has “very severe seizure disorders.” He noted that Mr. Leidelmeijen does not fit into that category.

Dr. Hildebrandt

Dr. Hildebrandt, Mr. Leidelmeijen’s treating dentist, testified in his July 2014 deposition, that his specialty is general dentistry. He testified that he has treated Mr. Leidelmeijen since 2008 for multiple trauma-related fractured teeth. He opined that, assuming Mr. Leidelmeijen’s history of having seizures was correct, more probably than not the seizures caused the fracturing of his teeth. He also opined that during the time he has treated him, Mr. Leidelmeijen “never presented with any teeth that were decayed by neglect.”
In addition to treating the fractured teeth, Dr. Hildebrandt testified that he also treated Mr. Leidelmeijen, beginning in May 2011, for TMJ. Dr. Hildebrandt testified that May 2011 was the first time that Mr. Leidelmeijen voiced complaints of TMJ. Dr. Hildebrandt explained that his partner, Elliot Guerin, D.D.S., has some special training in TMJ. For this reason, Dr. Hildebrandt referred Mr. Leidelmeijen to Dr. Guerin. In his report, Dr. Guerin noted the following regarding his examination of Mr; Leidelmeijen:
*49 [H]e presented with pain in his left ear, lower jaw, and chewing muscles along with ‘shooting pain’ in his left eye. He was referred back to us by his neurologist, Dr. Paul J. Hubbell, M.D., [who was a dentist' before becoming a physician] for these [TMJ] symptoms. Dr. Hubbell is treating him for his brain and cervical disc injuries, but diagnosed him with TMJ, or temporomandibular joint dysfunction, also.
Dr. Hildebrandt testified that Mr. Lei-delmeijen’s TMJ was consistent with his work-related accident; however, he explained that “[fit’s impossible to say TMJ dysfunction, what , caused it,” Dr. Hilde-brandt explained that in order to best treat 11(ihis TMJ, Mr. Leidelmeijen needed a splint to align his teeth and to take the pressure off the joint. He further explained that, in order to make a properly fitted splint, Mr. Leidelmeijen needed to first have several of his teeth that he was missing before the 2008 accident replaced. Dr. Hildebrandt testified that Mr. Leidel-meijen’s workers’ compensation insurer never authorized the replacement of those-teeth missing teeth.

Dr. DuBois

Dr. DuBois, Defendants’ dentist, testified, in his May 2014 déposition, that his specialty is general family dentistry. According to Dr. DuBois, before the 2008 accident Mr. Leidelmeijen was missing four teeth. Dr. DuBois testified that Mr. Leidelmeijen was in a “poor” state of dental health when he examined him and for some time before then. Dr. DuBois opined that “[t]he bulk of Mr. Leidelmei-jen’s dental problems are due to cavities and neglect.” Dr. DuBois opined that at least some of Mr. Leidelmeijen’s teeth that fractured were predisposed to fracture as a result of multiple missing, filled, and decayed teeth. He noted that people who have teeth that are predisposed to fracture can- fracture their teeth from every day wear and tear without trauma or . seizures. He also opined , that was what happened with Mr. Leidelmeijen. Dr. DuBois agreed that Mr. Leidelmeijen has TMJ. He explained that TMJ can be caused, by multiple missing, decayed and filled teeth. He, however, acknowledged that TMJ can also be caused by a trauma such as the 2008 accident or seizures^

Dr. Ortenberg

Dr. Ortenberg, a physical medicine and rehabilitation specialist, examined Mr. Lei-delmeijen on one occasion in May 2014 on referral from Defendants’ attorney. Dr. Ortenberg testified, in her July 2014 deposition, that a confusing part [17of this case is that “every time Remco [Leidelmeijen] gets treated for something, something else goes wrong.” She explained that was the reason some of the doctors believed there was a “psychogenic overlay because you can’t kind of cure him because if you cure him — if you give him what he wants for his TMJ, then maybe his back is going to hurt .more.” Dr. Ortenberg, in her report, enumerated the following list of thirteen complaints that Mr. Leidelmeijen has related to the 2008 accident;
1. Depression, agitation, anger, and panic attacks
2. Seizure disorder
3. Migraine headaches accompanied by nausea
4: Insomnia
5. Hearing loss
6. Tinnitus
7. TMJ and dental issues
8. Memory loss and cognitive impairments
9. Neck pain and right upper extremity' radicular symptoms
*50 10. Low back pain after a fall in June 2012 following a seizure[12]
11. Right'knée pain resulting from a - fall'after a seizure
12. Right shoulder pain
13. GI distress related to his medication's
In her report, Dr. Ortenberg indicated that “[m]any of the physicians who have examined [Mr. Leidelmeijen] over the years, even Dr. Mitchell, are concerned that his seizures are psychogenic in origin.” She noted that shé had “never seen a "seizure disorder develop after this type of head injury.” She echoed and agreed with Dr. Mitchell’s recommendation for inpatient EEG testing to determine the cause of Mr. Leidelmeijen’s seizures. She noted that “[i]f seizures are not documented, then of course Mr. Leidelmeijen will not require seizure 11Rmedications. Dr. Mitchell already indicated that he was at MMI [maximum medical improvement].”
Dr. Ortenberg further noted a number of inconsistencies between the records she reviewed and the history Mr. Leidelmeijen provided. For example, she noted that he told her that he had one suicide attempt about fifteen years ago, but the records indicated that he had a second suicide attempt in 2005.. Another example she mentioned was that despite Mr. Leidelmei-jen’s statement in his deposition that he goes to the emergency department every time he has a seizure, the only documented emergency department admission for a seizure was the one the week after the accident. She also commented that despite Mr. Leidelmeijen’s complaints of memory impairment and confusion, “he is able to name and spell all of his medications.” Overall, Dr. Ortenberg characterized this as a “very challenging and unusual presentation.”
On August 13, 20Í5, the WCJ rendered judgment in Defendants’ favor. In its judgment, the WCJ. made the following findings:
• That the claimant [Remco Leidelmei-jen] was involved in a work-related accident on November 11, 2008 while in the cour[se] and scope of employment with the employer;
• That Remco- Leidelmeijen is a malingerer as diagnosed by Dr. Megan Cio-ta, the Defendants’ Neuropsych[ologist] SMO, and confirmed by Dr. Paul Dammers, the Court-Appointed Neu-ropsych[ologist] expert. The Court was not persuaded by the report and testimony of Dr. Susan Andrews, the employee’s choice of [N]europsych[ologist]; ’ '
• That as a result of the malingering diagnosis, the employee has failed to meet his burden of proof as to entitlement of benefits and any and all benefits in this matter are to be terminated as of May 29, 2013, the date the claimant first underwent neuropsych[ology] testing for Dr. Megan Ciota that lead to the first diagnosis of malingering in this case;
lia* That in light of the finding that the claimant is a malingerer and other evidence in the record, the request for penalties and attorney’s fees by the employee, against the employer and the insurer, is denied.
The WCJ thus dismissed this matter with prejudice and cast all court costs against Mr. Leidelmeijen. This appeal followed.
*51 STANDARD OF REVIEW
Factual findings in workers’ compensation cases are reviewed under the manifest error standard. See Winford v. Conerly Corp., 04-1278, p. 15 (La.3/11/05), 897 So.2d 560, 569 (citing Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, p. 7 (La.7/1/97), 696 So.2d 551, 556). The manifest error standard applies even when, as here, the evidence before the WCJ consists solely of written reports, medical records, and depositions. Buxton v. Iowa Police Dep’t, 09-0520, pp. 18-19 (La.10/20/09), 28 So.3d 275, 287 (citing Bruno v. Harbert International, Inc., 593 So.2d 357, 361 (La.1992)). When the fact finder’s determination is based on its decision to credit the testimony of one of two or more witnesses, its determination'-'can virtually never be manifestly erroneous. Bellard v. American Central Ins. Co., 07-1335, 07-1399, p. 27 (La.4/18/08), 980 So.2d 654, 672 (citing Rosell v. ESCO, 549 So.2d 840, 845 (La.1989)). “This rule , applies equally to the evaluation of expert testimony, .including the evaluation and resolution of conflicts in expert testimony.” Bellard, supra (citing Lasyone v. Kansas City Southern Railroad, 00-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693). “The WCJ is afforded considerable discretion in evaluating expert testimony, and the decision to accept the testimony of one qxpert over the conflicting testimony of 18nanother can virtually never be manifestly erroneous.” Byrd v. Caddo Parish School Bd., 39,793, p. 8 (La.App. 2 Cir. 6/29/05), 907 So.2d 849, 854-55 (citing Anthony v. BE & K Construction, 32,729 (La.App.2d Cir.5/10/00), 760 So.2d 608); see also Bellard, supra; Snider v. Louisiana Med. Mut. Ins. Co., 14-1964, p. 5 (La.5/5/15), 169 So.3d 319, 323.
DISCUSSION
This is a medical benefits only case; as noted, the parties settled the indemnity benefits claim. The right to reimbursement for medical expenses is separate and distinct from the right to compensation. Schindler v. Orleans Reg’l. Sec., 03-0522, pp. 8-9,(La.App. 4 Cir. 12/3/03), 862 So.2d 1032, 1039 (citing Parfait v. Gulf Island Fabrication, Inc., 97-2104, p. 9 (La.App. 1 Cir. 1/6/99), 733 So.2d 11, 19). An employer has a statutory duty to furnish an employee with all necessary medical treatment caused by a work-related injury. La. R.S. 23:1203(A) (providing that the employer shall provide all necessary treatment, including “medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal.”)
Under this statute, “the facts which give rise to’ a party’s right to judicially assert an action under La. R.S. 23:1203(A) are: (1) a work-related injury or accident and (2) a medical treatment that is necessary and causally connected to the injury.” Church Mut. Ins. Co. v. Dardar, 13-2351, pp. 14-15 (La.5/7/14), 145 So.3d 271, 281-82. To recover medical expenses under La. R.S. 23:1203(A), the claimant must prove those two facts by a preponderance of the evidence. See Schindler, 03-0522 at p. 9, 862 So.2d at 1039.[13] A claimant is not entitled to recov *52 er for medical expenses if he or she fails to substantiate a claim. Schindler, 20-0522 at p. 9, 862 So.2d at 1039. Whether a claimant is entitled to medical benefits is a question of fact, and the fact finder’s resolution of that issue may not be disturbed on appeal in the absence of manifest error. See Evans v. Waste Management of New Orleans, 04-2043, p. 4 (La.App. 4 Cir. 5/11/05), 904 So.2d 38, 40.
The WCJ found, and we agree, that Mr. Leidelmeijen suffered a work-related accident and an injury on November 11, 2008. The narrow issue is whether Mr. Leidel-meijen met his burden of proving that the medical treatment that he seeks to relate to that accident and injury is “necessary arid causally connected to the injury.” Church Mut. Ins, supra. Finding he did not meet his burden, the WCJ relied upon the malingering diagnosis of two of the 'neuropsychologists; the WCJ reasoned “[tjhat as a result of the malingering diagnosis, the employee has failed to meet his burden of proof as to entitlement of benefits and any and all benefits in this matter are to be terminated as of May 29, 2013, the date the claimant first underwent neu-ropsych testing for Dr. Megan Ciota that lead to the first diagnosis of malingering in this case.”
On appeal, Mr. Leidelmeijen asserts the WCJ committed manifest error when it failed to award him the following:
|¾¾1. Reimbursement for out of pocket medical expenses to claimant.
2. IWP payment for medicines provided to claimant.
,•3. Dr. Hildebrandt payment for medically necessary and approved dental treatment.
4. Claimant medically necessary and related dental treatment.
He further assigns as error the WCJ’s finding “that claimant was a malingerer not entitled to medical treatment for the period of 2008 through 2013 and beyond when none of his treating physicians ever made such a determination.” Because we find the malingering diagnosis dispositive of most, if not all, of Mr. Leidelmeijen’s claims, we first address that issue. Following our discussion of that issue, we address the remainder of Mr. Leidelmei-jen’s assignments of error.

Malingering diagnosis issue

As noted, we find the dispositive issue in this case is whether the WCJ was manifestly erroneous in accepting the experts’ malingering diagnosis and thus concluding that Mr, Leidelmeijen was not entitled to any of the medical expenses that he seeks to recover. This issue is dispositive because' a malingering diagnosis — which means a claimant is feigning or faking his or her injuries[14] — renders a claimant unable to meet his or her burden of proving that the medical expenses the claimant seeks were for necessary medical treatment caused by a work-related injury.
IsbAb a commentator has noted, “it is often very difficult to distinguish between the employee who is genuinely disabled *53 due to mental conditions and the malingering employee, and it is just as important that we deny compensation to the latter: as it is that we compensate the former.” H. Alston Johnson III, 13 La. Civ. L. Treatise, WORKERS’ COMPENSATION LAW AND PRACTICE § 235 (5th ed. 2015). To establish a malingering diagnosis, “an independent neuropsychological examination, particularly one done by, a neuropsychologist using standard batteries of tests with validity scales, can be quite useful.” Michael J. Hannan, III, The Forensic Neuropsychological IMF, Litigation 52, 53 (2009).[15]
In this case, Mr. Leidelmeijen had four neuropsychological examinations — in 2009 with Dr. Dickerson on referral by Dr. Mitchell, in 2013 with Dr. Andrews on referral by Dr. Denney, in 2013 with Dr. Ciota on referral by Defendants, and in 2015 with Dr. Dammers on referral by the WCJ. Although Dr. Dickerson did not make a diagnosis, he did note “poor effort.” Dr. Ciota diagnosed Mr. Leidelmei-jen with malingering; conversely, Dr. Andrews opined that he was not malingering. Given this dispute between two experts in neuropsychology, Defendants filed a motion to have the court appoint an IME in neuropsychology - to address and resolve the dispute. Dr. Dammers, the court-appointed neuropsychologist, agreeing with Dr. Ciota, likewise diagnosed Mr. Leidel-meijen with malingering. The WCJ agreed with the malingering' diagnosis of Dr. Ciota and Dr. Dammers, and disagreed with Dr. Andrews.
On appeal, Mr. Leidelmeijen contends that the WCJ was manifestly erroneous in accepting the malingering diagnosis. He emphasizes that none of his ^treating physicians ever made such a diagnosis; his treating doctors — Dr. Mitchell. (neurologist) and Dr. Denney (psychiatrist) — and Defendants’ neurologist-Dr. Trahant — all opined that he was not a malingerer. Likewise, Dr. Andrews, his neuropsychologist, opined that he was not a malingerer. He contends that there is not a single malingering report close in time to the accident. Indeed, he emphasizes that the doctors who have diagnosed him with malingering are very new to this case. Dr. Ciota and Dr. Dammers saw him in 2013, five years after the accident, and 2015, eight years after the accident, respectively. Hence, he submits that the malingering diagnosis is too far removed from the 2008 accident to be valid.
Mr. Leidelmeijen next argues that “[w]hen one weighs all the evidence in this case regarding malingering, putting all of the evidence on the scale, there are more doctors saying [he] is not a malingerer than are saying he is one.” Simply put, his position is that “there are many more doctors who have treated [him] for much longer period who say he is not a malingerer than those who say he is.” Thus, he contends that there can only be one conclusion — he is not a malingerer. Contrary to Mr. Leidelmeijen’s contention, courts do hot make factual determinations by counting expert witnesses. It is well-settled that the number of witnesses is not a decisive factor as “ ‘[witnesses are weighed and not counted. A fundamental function of the trier of fact, be it judge or jury, is to determine the facts and this is not done by counting noses.’ ” South Central Bell Tel. Co. v. Eisman, 430 So.2d 256, 258-59 (La.App. 4th Cir.1983) (quoting U.S. Fidelity and Guaranty Co. v. Fiffie, *54 211 So.2d 690 (La.App. 4th Cir.1968)).[16]
|gJMr. Leidelmeijen also cites the settled jurisprudential principles that a treating physician should be given more' weight than a one-time evaluator and that a positive finding should be given greater weight than a negative finding.[17] In addressing this point, we note that the following additional settled jurisprudential principles are pertinent. First, the treating physician’s testimony is rebuttable; and a “trier of fact is required to weigh the testimony of all medical witnesses.” McCorkle v. Mgmt. Servs. USA, Inc., 12-1609, p. 7 (La.App. 4 Cir. 4/24/13), 113 So.3d 616, 620.[18] Second, although the treating physician’s testimony is generally given substantial weight, a court-appointed expert’s opinion must be considered as pri-ma facie evidence of the facts therein stated. La. R.S. 23:1123; Fritz v. Home Furniture-Lafayette, 95-1705 (La.App. 3 Cir. 7/24/96), 677 So.2d 1132. Explaining this second principle, this court in Bell v. Mid City Printers, Inc., 10-0818, p. 11 (La.App. 4 Cir. 12/22/10), 54 So.3d 1226, 1234, stated as follows:
La. R.S. 23:1123, which provides for the appointment of an IME when there is a conflict in the medical evidence, providés that the report of the IME shall be prima facie evidence of the facts -therein stated. The courts have interpreted La. R.S. 23:1123 to mean that an IME’s medical conclusions should be given significant weight because the IME is an objective witness. Frye v. Olan Mills, 44,192 p. 6 (La.App. 2 Cir. 4/8/09), 7 So.3d 201, 205; Marks v. 81 Lumber Co., 2006-0358, p. 7 (La.App. 3 Cir. 9/27/06), 939 So.2d 723, 730. Nevertheless, the opinion of the IME is not conclusive, and the trial judge must evaluate all of the evidence presented in making a decision as to the claimant’s condition. Richardson v. Lil' River Harvesting, 2009-1090, p. 2 (La.App. 3 Cir. 3/10/10), 33 So.3d 418, 419; Cortez v. East Jefferson General Hospital, 2008-0653, p. 10 (La.App. 5 Cir. 19.4/13/09), 7 So.3d 707, 713. The weight given to the'testimony of an IME can be lesser or greater depending on the qualifications or expertise of the physician; the type of examination he performs, his opportunity to observe the patient, his review of other physicians’ examinations and tests, and any other "relevant factors] Green v. Louisiana Coca Cola Bottling Co., Ltd., 477 So.2d 904 (La.App. 4 Cir.1985).
Applying these principles, we find no manifest error in the WCJ’s decision to adopt the malingering - diagnosis of Dr. Dammers, the court-appointed IME in neuropsychology. Before making the malingering diagnosis, Dr. Dammers person *55 ally interviewed Mr. Leidelmeijen and put him through a battery of neuropsychological testing. Dr. Dammers also reviewed a plethora of medical records and deposition testimony as well as the prior neuropsy-chological testing results of three other neuropsychologists — Dr. Dickson, Dr. Ci-ota, and Dr. Andrews — to reach his conclusion. The fact that he had three other sets of neuropsychological testing was unusual, in Dr. Dammers’ experience, and made him even more confident in his malingering diagnosis.
Moreover, as Defendants emphasize, Dr. Mitchell, Mr. Leidelmeijeris treating neurologist, recanted on his opinion voiced in his 2014 deposition that Mr, Leidelmeijen was not a malingerer; in his May 2015 report, Dr. Mitchell stated that, he was “more inclined to lean to malingering in this patient.” The evidence in the record thus supports the WCJ’s decision to adopt the malingering diagnosis. We find no manifest error in that decision. Indeed, as noted above, “the [WCJ’s] decision to accept the testimony of one expert over'the conflicting testimony of another can virtually never be manifestly erroneous.” Byrd, supra.

Remaining issues

Mr. Leidelmeijeris remaining assignments of error can be grouped into the following five categories: (i) dental and TMJ treatment; (ii) psychiatric treatment; 127(11!) seizure treatment; (iv) related prescription expenses; and (v) penalties and attorney’s fees.[19] We separately address each category.

(i) Dental and TMJ treatment

Mr. Leidelmeijen contends that he still has cracked teeth and TMJ. He notes the original cracked teeth, were related to' the accident and the subsequent cracked teeth were related to his seizures. He contends that both his cracked teeth and TMJ are directly related to the accident. He acknowledges that Defendants have paid for some • of his dental expenses to fix his cracked teeth and' have approved á splint to treat his TMJ: He, however, points out that the approved splint would not work due to his other dental issues — missing teeth.
Defendants counter that they have paid over $20,000.00 in dental expenses in this case, including the costs to fix the teeth fractured in the accident. Defendants contend that since Mr. Leidelmeijen is alleging that his current need for dental care is related predominately to fractured teeth as a result of seizures, the malingering diagnosis means that he cannot meet his burden of proof as to seizures; thus, his current dental issues must be due to his pre-existing dental conditions. Alternatively, Defendants contend that Mr. Lei-delmeijen cannot meet | gshis burden of proving that his current need for dental treatment is related to. the 2008 accident.
*56 Conflicting testimony was presented by the two dentists whose depositions are included in the record—Dr. Hil-debrandt (Mr. Leidelmeijen’s) and Dr. DuBois (Defendants’)—regarding Mr. Lei-delmeijen’s dental health. Dr. DuBois testified that Mr. Leidelmeijen’s dental health was poor and that “[t]he bulk of Mr. Leidelmeijen’s dental problems are due to cavities and neglect.” Dr. Hilde-brandt disagreed. The record, however, establishes that Mr.- Leidelmeijer had preexisting dental problems. Insofar as the TMJ, neither Dr. Hildebrandt nor .Dr. Du-Bois could definitively relate it to the 2008 accident. Regardless, it is undisputed that the reason a workable splint could not be made for treatment of Mr. Leidel-meijen’s TMJ was because he was missing several teeth from before the 2008 accident.[20]
Although pre-existing conditions do not preclude a claimant from seeking workers’ compensation benefits, a claimant is entitled to benefits for aggravation of a preexisting condition for only as long as the aggravation continues. See Our Lady of Lake Reg’l Med. Ctr. v. Matthews, 06-1584, p. 11 (La.App. 1 Cir. 9/26/07), 971 So.2d 354, 362, n. 9 (citing Fuselier v. International Maintenance Corp., 94-792 (La.App. 3 Cir. 2/1/95), 649 So.2d 1197, 1202). In this case, the WCJ made an implicit finding, which the record supports, that any continuing dental or TMJ problems that Mr. Leidelmeijen is suffering are not related to the [⅞92008 accident.[21]- We thus find no manifest error in the WCJ’s denial of any additional dental or TMJ expenses.

(ii) Psychiatric treatment

Mr. Leidelmeijen contends that “an underlying psychological component is at work here and could be the reason [he] is having seizures.” For this reason, he contends that ongoing psychiatric treatment is necessary. He further points out that even Defendants’ choice of psychiatrists—Dr. Harold' Ginzburg and Dr. Richard Roniger—opined that he needed intensive psychiatric treatment. Likewise, he points out that the two neurologists— Dr. Mitchell (Mr. Leidelmeijen’s) and Dr. Trahant (Defendants’)—and his neuropsy-chologist—Dr. Andrews—have opined that he would benefit from ongoing psychiatric treatment. Defendants, on the other hand, cite Dr. Dammers’ testimony that Mr. Leidelmeijen does not require any additional psychiatric treatment for the index accident.
As noted elsewhere, Mr. Leidelmeijen had a significant pre-accident mental health history of two prior suicidal attempts and anxiety issues. Moreover, the *57 recommendations of Dr. Ginzburg, Dr. Ronigér, Dr. Mitchell, and Dr. Trahant regarding Mr. Leidelmeijen’s need for psychiatric treatment were made in the context of determining the cause of his seizures. Given Mr. Leidelmeijen’s significant pre-accident mental health history, the malingering diagnosis, and Dr. lahDammers testimony that he could not relate the need for mental health treatment to the index accident,' we find no manifest error in the WCJ’s denial of Mr. Leidelmeijen’s claim for psychiatric treats ment. Any psychiatric treatment Mr. Leidelmeijen requires, as with the dental or TMJ treatment, is related to his preexisting conditions and not the 2008 accir dent.

(ii) Seizure treatment

 As to the seizure treatment, -Mr. Leidelmeijen contends that ongoing treatment for seizures is medically .necessary. He acknowledges that the court-ordered inpatient EEG testing was negative; nonetheless, he contends that he “should'be allowed to be monitored by Dr. Mitchell while he is weaned off the medication.” He further contends that “[i]t would be very dangerous to • [him] if he is not weaned and monitored while doing so.” Other than his own arguments, however, he presented no proof that it would be .a danger for him to be weaned off the seizure medication without monitoring. See Schindler, 20-0522 at p. 9, 862 So.2d at 1039 (holding that a claimant is not entitled to recover for medical expenses if he or she fails to substantiate a claim).
In his May 2015 report, Dr. Mitchell indicated that the only reason he was continuing Mr. Leidelmeijen on the seizure medication Depakote was for mood stabilization. Likewise, Dr. Ortenberg noted that “[i]f seizures are not documented, then of course Mr. Leidelmeijen will not require seizure medications. Dr. Mitchell already indicated that he was at MMI [maximum medical improvement].” Dr. Dammers echoed this opinion; he testified that he could not relate the need for any future seizure medication to the subject accident. Given the malingering diagnosis coupled with the lack of any documented proof of the need for continuing lip treatment for seizures, we find no manifest error in the WCJ’s denial of these expenses.

(iv) Related prescription expenses

' Mr. Leidelmeijen contends that the WCJ erred in failing to find Defendants liable for outstanding prescription éxpenses paid for by him and by IWP. He claims that he paid for prescription medication out of pocket — a total of $192.41 at one pharmacy, and $852.32 at another — for medications prescribed by Dr. Hildebrandt (his dentist), Dr. Denney (his psychiatrist), and (Dr. Mitchell (his neurologist). He likewise claims, that IWP provided over ,$95,533.28[22] in medications prescribed by approved providers for which it was never paid.
Defendants counter that given the-malingering diagnosis they never should have been responsible for the massive amount of prescription drugs Mr. Leidelmeijen has been taking.[23] Defendants emphasize Dr. Dammers’ testimony that he could not relate the need for any future seizure medi *58 cation or mental health treatment to the subject accident. Dr. Dammers’ testimony, Defendants contend, eliminates the .vast, majority of prescription medications attributable to the subject accident at issue that were.filled by IWP. Finally, Defendants point out that in January 2014, LUBA notified IWP in writing that it was no. longer an authorized pharmacy for any of their workers’ compensation cases effective February.2014. Defendants also note they paid $17,316.18 in prescription expenses to IWP for | ¡¡¡¡.prescriptions filled before February 2014; and after February 2014, they paid about $20,000.00 in prescription expenses to the LUBA’s authorized pharmacy service.
Insofar as the IWP bill, we note, contrary to Defendants’ contention, this court recently held that the choiee of pharmacy belongs to the employee. Burgess v. Sewerage & Water Bd. of New Orleans, 15-0918 (La.App. 4 Cir. 2/3/16), 187 So.3d 49. Our finding in Burgess, however, has no impact on the prescription expensés at issue in this case. LUBA did not send thé letter to IWP invoking its alleged right to select the pharmacy until February 2014, which was well after May 29, 2013 — the date on which the WCJ held that any and all benefits in this case términated. Given our findings above that Mr. Leidelmeijen failed to establish the medió'al necessity for dental, psychiatric, or seizure treatment related to the 2008 accident coupled with the malingering diagnosis, we find no manifest error in the trial court’s denial of Mr. Leidelmeijen’s request.for' payment of any additional prescription expenses, .

(v) Penalties and attorney’s fees ,

Statutory penalties and attorney’s fees shall be awarded if the employer or insurer fails to timely pay benefits due the claimant under La. R.S. 23:1201 unless: (1) the claim is reasonably controverted or (2) such nonpayment results from conditions over which the employer or insurer had no control. See Brown v. Texas-LA Cartage, Inc., 98-1063, p. 8 (La.12/1/98), 721 So.2d 885, 890, In Brown, the Louisiana Supreme Court translated the term “.reasonably controvert” to mean that “a court must ascertain whether the employer or his insurer engaged in. & nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant [^throughout the time he refused to pay all or part of the benefits allegedly owed.” Brown, 98-1063 at p. 9, 721 So.2d at 890.
In Bell, supra, this court noted the following principles regarding penalties and attorney’s fees in workers’ compensation cases:
The decision to impose penalties and attorneys’ fees is essentially a factual issue subject to the manifest error-clearly wrong standard of review. Authement v. Shappert Engineering, 2002-1631, p. 12 (La.2/25/03), 840 So.2d 1181, 1188-89. Awards of penalties and attorneys’ fees in compensation cases are essentially penal, and are intended to deter indifference and undesirable conduct by employers and . their insurers toward injured workers; Trahan v. Coca Cola Bottling Co, 2004-0100, p. 17 (La.3/2/05), 894 So.2d 1096, 1108. Although the benefits in.workers’ compensation cases are to be liberally construed, penal statutes are , to b.e strictly construed. Smith v. Quarles Drilling Co., 2004-0179, p. 7 (La.10/29/04), 8$5 So.2d 562, 566. Penalties should not be imposed in doubtful cases, where a bona fide dispute exists as to the claimant’s entitlement to benefits. J.E. Merit Constructors Inc. v. Hickman, 2000-0943, p. 5 (La.1/17/01), 776 So.2d 435, 438.
10-0818 at p. 15, 54 So.3d at 1236.
Mr. Leidelmeijen contends that because Defendants did not reasonably *59 controvert his claims, not only should they be held responsible for the payment for all medically necessary and related medical treatment, but also should be compelled to pay penalties, interest, costs and attorney fees pursuant to La. R.S. 23:1201(F). Anticipating Défendants’ counter argument that the malingering diagnosis bars recovery for any future medical treatment, Mr. Leidelmeijen contends that even if this court agrees with Defendants regarding the need for future seizure and psychiatric treatment, this court cannot find in Defendants’ favor regarding past.due medical payments, the need for dental treatment, and a splint for the TMJ. He thus contends that for the later items penalties, interest, costs, and attorney’s fees are mandated. Defendahts counter that, at a minimum, all of Mr. ■ Leidelmeijer’s claims have been reasonably controverted and that the WCJ was not | ^manifestly erroneous in finding they owed no penalties, interest, costs, or attorney’s fees.
Given our findings in Defendants’ favor regarding dental, TMJ, psychiatric, and seizure treatment and related prescription expenses coupled with the malingering diagnosis, we find the record establishes that Defendants reasonably controverted all of Mr. Leidelmeijen’s claims. The WCJ thus was not manifestly erroneous in denying his request for penalties, interest, costs, and attorneys’ fees.

DECREE

For the foregoing reasons, the judgment of the Workers’ Compensation Judge is affirmed.
AFFIRMED
We note- that the record includes one estimate of Mr. Leidelmeijen’s monthly prescription expenses to be $3,924.22, which is undated but includes sixteen prescriptions. We further note that as, of June 2015 Defendants paid $203,162.33 for drugs in this case.

.On November 13, 2008, Mr. Leidelmeijen was seen at, Elmwood Medical Center by Femcrest’s doctor. Ferncrest’s doctor diag‘nosed him as having a scalp contusion, possible concussion, loose teeth, and receding gums. Although a copy,of the Elmwood Medical Center records is not in the recordj several of the other medical providers’ reports reference the Elmwood visit and Femcrest’s doctor’s diagnosis.

. In the trial court, Defendants refuted this claim with proof that these two expenses had been authorized. Mr. Leidelmeijen does not raise this claim pn appeal.

. In the settlement statement, it is noted that, as of December 2013, LUBA had paid a total of $301,794.00 in medical expenses.

. Dr. Susan Andrews was Mr. Leidelmeijen’s choice of neuropsychologist.

. As noted above, both Dr. Mitchell and Dr. Trahant recommended inpatient EEG testing.

.In the trial court, Mr. Leidelmeijen outlined his requested relief as follows:
• Payment of the related bills of Dr. Hilde-brandt already presented to Ferncrest Man- or and LUBA, which total $2,699.68;
• Payment of IWP for the prescriptions provided to Remco Leidelmeijen before February 7, 2014;
• Reimbursement of $1,044.73 for his out of pocket prescription costs;
• Reimbursement of out of pocket dental expenses totaling $4,650.00 related to his work injuries;
• Providing of all necessary and related dental treatment therapies recommended by Dr. Hildebrandt said services detailed in his deposition and subsequent written proposal, which costs $9,850.00;
• Providing of treatment with Dr. Mitchell and seizure medicines until such time as he is sweaned off of the seizure medication.
• Providing of all medically necessary and related psychiatric treatment and medicines pursuant to the fee schedule.
«Payment of penalties totaling $4,000.00 for the únreasonáble handing of his claims for medical treatment.
Mr. Leidelmeijen also sought attorneys’ fees of $20,000.00, court costs of $178.56, and judicial interest,

. The correct date of the accident is November 11, 2008, as noted elsewhere in this opinion.

. "Psychogenic seizures are non-organic, That is, they are the result of psychological/psychiatric problems.” Morris v. Ferriss, 95-1790, p. 3 (La.App. 4 Cir. 2/15/96), 669 So.2d 1316, 1319, n. 4.

. Dr. Trahant’s reports are quoted earlier in this opinion.

, . Dr. Ciota’s testing of Mr. Leidelmeijen actually spanned two days-May 29 and 30, 2013,

. Dr.. Dickerson’s report, which is in the record, further states that Mr. Leidelmeijen reported he grinds his teeth.

. According to Dr. Ortenberg’s report, Mr. Leidelmeijen “uses his primary insurance to get injections from Dr. Hubbard to treat this [low back pain] and his low back symptoms are not covered by his workers’ compensation claim. Becáuse of falls, he has also developed right knee pain ’and right shoulder pain.” - ' .■

. Defendants contend that because this case involves an alleged "physical/mental” injury — Mr. Leidelmeijen’s seizures are mental, not physical in origin — an elevated, clear and convincing burden of proof applies. See La. R.S. 23:1021(7); see also Charles v. South Central Industries, 96-0883, p. 6 (La. 11/25/96), 683 So.2d 706, 709 (admonishing that " 'reviewing courts must analyze claimed disability caused by mental conditions with utmost caution in view of the nebulous characteristics of mental conditions and the possibility of symptoms being easily ^feigned.” ”) Because we find that even under a preponderance of the evidence standard Mr. Leidelmeijen failed to meet his burden of *52 proof, we do not find it necessary to address whether the clear and convincing standard applies here.

. The most consistent definition of malingering is "a deliberate, ■ conscious feigning of symptoms for an ulterior purpose (e.g., avoiding work, receiving money, prolonging an illness with the intent to avoid a responsibility, avoidance of punishment or prosecution, or obtaining medications).” Michael J. Hannan, III, The Forensic Neuropsychological IME, Litigation 52, 53 (2009); see also Bryan A. Garner, BLACKS LAW DICTIONARY 978 (8th ed.2004) (defining malingering to méan ”[t]o fein illness or disability, esp. in an attempt to avoid an obligation or to continuing receiving disability benefits,”).

. Ijr. Trahant agreed, stating that that his opinion had to be colored and influenced by-•what the. neuropsychologists find.

. See also Bourg v. Cajun Cutters, Inc., 14-0210, p. 26 (La.App, 1 Cir. 5/7/15), 174 So.3d 56, 73; Peyton v. Wade, 181 So.2d 878 (La.App. 4th Cir. 1966); Conieaux v. Cameron Offshore Servs., Inc., 420 So.2d 1209, 1213 (La.App. 3rd Cir.1982).

. The jurisprudence is well-settled that the treating physician’s , testimony generally should be accorded greater weight than that of a physician who examines a patient only once or twice. Duplessis v. Tulane Univ. Med. Ctr., 10-0267, p. 8 (La.App. 4 Cir. 8/25/10), 47 So.3d 992, 997 (citing Williams v. Wal-Mart Stores, Inc., 00-0863 (La.App. 4 Cir. 5/16/01), 787 So.2d 1134). Another settled jurisprudential principle is that positive 'findings of medical experts are to be afforded greater weight than the negative fíndings as to the existence or not of a particular condition. Smith v. Highlands Ins. Co., 222 So.2d 540, 544-45 (La.App. 4th Cir.1969).

. Mosley v. Pennzoil Quaker State, 37,199, p. 4 (La.App. 2 Cir. 7/23/03), 850 So.2d 1100, 1103; Celestine v. U.S. Fidelity & Guaranty Co., 561 So.2d 986, 991 (La.App. 4th Cir.1990).

. In his brief, Mr. Leidelmeijen prays for the following relief: 1. That this court find that the claimant has sustained his burden of proof regarding accident and injury. 2. That the claimant injured his teeth in the work accident. 3. That the claimant suffered sei- ■ zures which are. related to the work accident. 4. That as a result of the seizures the claimant continued to bréale teeth. 5. That the claimant suffers from TMJ as a result of the accident. 6. That the claimant is entitled to dental work related to the work accident and injury. 7. That the claimant is entitled to a properly fitting splint to treat his TMJ issues. 8. That the claimant is entitled to ongoing monitoring by his neurologist as he is weaned off of the seizure medication. 9. That the claimant is entitled' to ongoing psychiatric treatment. 10. That the claimant is entitled to reimbursement of his out of pocket medical expenses. 11. That Dr. Hildebrapdt is entitled to payment for his approved medical treatment and for payment to complete the necessary therapies to the claimant's teeth.

. In the Elmwood medical records from shortly after the accident, Mr. Leidelmeijen was noted to have receding gums.

. In correspondence dated May 17, 2011, Dr. Hildebrandt acknowledged that Defendants had paid to replace three of Mr. Leidel-meijen’s missing teeth, that "[t]he best restoration for Remco [Leidelmeijen] would be a fixed implant bridge replacing all missing teeth,” and that to do so "Remco would need to pay for the portion of the appliance hot covered by Workers Compensation]. Rem-co’s portion of the cost is $2,970.00” The letter requested an advance of Mr. Leidelmei-jen’s settlement to continue with this TMJ treatment. In an April 2014 report, Dr. Hil-debrandt stated that "[t]he only way to treat the TMJ dysfunction is to replace the missing posterior teeth.... [I]f the TMJ dysfunction can be attributed to the trauma and post traumatic seizures, and the only way to treat the TMJ is to replace missing posterior teeth, then whether or not the tooth loss was preexisting or caused by trauma does not really matter.” As noted, Dr. Hildebrandt testified that Defendants never paid to replace the teeth that were missing before the 2008 accident.

. We note that the appellant’s brief refers to this amount as $995,553.28, which is an apparent typographical error. In his brief to the WCJ, he lists this amount as $95,553.28.

. We note that the record includes one estimate of Mr. Leidelmeijen’s monthly prescription expenses to be $3,924.22, which is undat-eh but includes sixteen prescriptions. We further nbte that as of June 2015 Defendants paid $203,162.33 for drugs in this case.